## 852 A.2d 114

## David TRIGGS, Jr.

### v.

## STATE of Maryland.

## No. 118, Sept. Term, 2003.

## Court of Appeals of Maryland.

## June 16, 2004.

28

Bradford C. Peabody, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), for petitioner.

Shannon E. Avery, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondent.

Kerri L. Ruttenberg, King & Spalding, LLP, Washington, DC, Joan S. Meier, brief of Amici Curiae Domestic Violence Legal Empowerment and Appeals Project, House of Ruth Maryland, and the Women's Law Center of Maryland on behalf of respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, J.

We are called upon in this case to determine whether it was error for the trial judge to impose eighteen consecutive sentences when the defendant was convicted for making eighteen

threatening calls to his wife in violation of a protective order requiring that he have "no contact" with his wife. We find no error in the sentence.

## I. Introduction

### A. Facts

On Sunday morning, September 16, 2001, David Triggs (hereinafter "Petitioner") made the first of dozens [1] of calls to his ex-wife, Pamela Triggs (hereinafter "Mrs. Triggs"), who lived in Montgomery County, in violation of a protective order prohibiting him from having any contact with her. When he made many of the calls, which continued over a four-day period, Petitioner threatened to rape and murder his ex-wife and murder their three children, who were with him during a scheduled visitation when he called.

Petitioner and Mrs. Triggs were married for almost seven and a half years when they divorced on March 1, 2002. They had three children together, who were eight, six, and four at the time of their divorce. Petitioner's four-day "reign of terror," as Judge Ann S. Harrington, Circuit Court for Montgomery County, called it, was the culmination of a long history of a troubled relationship filled with domestic abuse.

In her victim impact statement, Mrs. Triggs described some of Petitioner's controlling and abusive behavior that occurred over the course of their marriage and during the period at issue during this case. According to Mrs. Triggs, Petitioner, in the past, had held electric hedge clippers to her throat, pointed a gun to her head, fired a gun at her, and raped her four times. In 1996, she obtained her first protective order after Petitioner shot at her.

---

1. Thirty-two messages were recorded on Mrs. Triggs's home and cell phone voice mail, beginning at 11:46 a.m. on September 16, 2001 and ending at 1:01 a.m. on September 19, 2001. The State offered into evidence Sprint telephone bills indicating that Petitioner made more than fifty calls to Mrs. Triggs from Sunday, September 16, 2001 to Wednesday, September 19, 2001.

When Mrs. Triggs attempted to leave her husband, Petitioner harassed her friends who were helping her, causing them to get peace orders against him. Petitioner also harassed Mrs. Triggs at work and threatened to kill her co-workers, which resulted in her place of work closing for two days and hiring security for three weeks. Mrs. Triggs claims she "lost [her] job because of him." In addition, the couple lost their home and Mrs. Triggs's credit record was ruined when Petitioner refused to sign the papers to sell their home, telling the realtor he preferred to have the home foreclosed so as to "destroy" Mrs. Triggs.

Mrs. Triggs also described how Petitioner verbally abused her and attempted to control her every move and thought. He dictated the types of clothes she could wear ("no sweatpants or baggy clothes allowed"), taped her telephone calls, removed her car radio, and disabled her car on several occasions. During the month before they separated, he would wake her up every time she fell asleep, "allowing only one hour a night." After they separated, Mrs. Triggs related how Petitioner would tell the children to "tell mommy her cement shoes are coming," "tell mommy I am going to cut her head off," "tell mommy she doesn't have long to live," and "tell mommy I'm watching."

On September 26, 2000, Mrs. Triggs obtained her second order of protection from the District Court of Maryland sitting in Montgomery County. She stated she was afraid for her life because her husband had shot at her in the past and sought the order because he "wanted her to get an apartment and prostitute herself to support the family" and threatened to "burn her like a witch on a stick" if she did not comply. The court issued an order, effective for one year, requiring Petitioner to refrain from threatening or abusing Mrs. Triggs and to begin counseling immediately.

On March 28, 2001, the court amended the September 26 protective order pursuant to Mrs. Triggs's emergency motion to modify the order, ordering, among other things, that Petitioner have "no contact" with Mrs. Triggs, that he could not

take the children out of the state or out of school "if it was not his scheduled time," and that he must abide by a two-week visitation schedule requiring him to pick up his children from school on Friday and drop them off at school on Monday. One month later, in April 2001, Petitioner violated the protective order by banging on Mrs. Triggs's door in the middle of the night. Mrs. Triggs called the police, who arrested Petitioner when he tried to flee the apartment complex in his car.

While he was in jail awaiting trial, Petitioner sent numerous letters to his children containing disturbing references to Mrs. Triggs and their marriage. Mrs. Triggs filed a complaint about the letters with the police commissioner because she feared for her and her children's personal safety.

On July 23, 2001, Petitioner was convicted for violating the March 28 amended protective order. He was sentenced to 90 days in the Montgomery County Detention Center, with 36 days suspended and credit for 54 days, and one year of supervised probation. He was ordered, again, to have no contact with Mrs. Triggs.

In mid-September 2001, a bench warrant was issued from the Circuit Court for Petitioner's arrest because Petitioner was telling his children that he wanted to put his wife in "cement shoes." Because of a technical problem with the warrant, however, the Sheriff's Office for Montgomery County could not arrest Petitioner before he picked up his children on September 14, 2001, for his scheduled two-week visitation.

On September 16, 2001, at approximately 11:45 on Sunday morning, Petitioner made the first of more than fifty calls occurring over a four-day period to Mrs. Triggs.[2] Petitioner

---

2. The chart below indicates the day and time of the calls Petitioner made from September 16 to September 19, 2001, that had messages associated with them that were recorded on Mrs. Triggs's home and cell phone voice mail:

| Day | Time |
|---|---|
| 1 September 16, 2001 | 11:46:06 a.m. |
| 2 September 16, 2001 | 11:47:58 a.m. |
| 3 September 16, 2001 | 11:48:58 a.m. |

called Mrs. Triggs while she was at home alone in her apartment in Gaithersburg. After Mrs. Triggs reminded Petitioner that he should not be calling her because of the protective order, he said, "I don't give a fuck about a piece of paper, are you going to talk to me, you need to talk to me." When she did not respond, he continued saying, "God dammit, Pamela, these children are dead by the end of this weekend. I don't want them, I want you, but I will kill them." Mrs. Triggs hung up and called the police immediately.

Three Gaithersburg police officers arrived at Mrs. Triggs's house in response to her call. While she waited for the police, the phone rang about six times with the "Caller–ID" showing

| | | |
|---|---|---|
| 4 | September 16, 2001 | 11:50:12 a.m. |
| 5 | September 16, 2001 | 11:54:26 a.m. |
| 6 | September 16, 2001 | 11:55:55 a.m. |
| 7 | September 16, 2001 | 12:51:26 p.m. |
| 8 | September 16, 2001 | 1:06:02 p.m. |
| 9 | September 16, 2001 | 1:06:55 p.m. |
| 10 | September 16, 2001 | 1:08:26 p.m. |
| 11 | September 16, 2001 | 1:09:01 p.m. |
| 12 | September 16, 2001 | 9:17:45 p.m. |
| 13 | September 16, 2001 | 10:30:32 p.m. |
| 14 | September 16, 2001 | 10:31:36 p.m. |
| 15 | September 17, 2001 | 1:55:49 p.m. |
| 16 | September 17, 2001 | 8:53:08 p.m. |
| 17 | September 17, 2001 | 9:21:14 p.m. |
| 18 | September 17, 2001 | 9:51:20 p.m. |
| 19 | September 18, 2001 | 10:22:07 a.m. |
| 20 | September 18, 2001 | 2:52:20 p.m. |
| 21 | September 18, 2001 | 5:34:35 p.m. |
| 22 | September 18, 2001 | 5:41:46 p.m. |
| 23 | September 18, 2001 | 8:35:33 p.m. |
| 24 | September 18, 2001 | 9:07:09 p.m. |
| 25 | September 18, 2001 | 9:30:04 p.m. |
| 26 | September 18, 2001 | 9:56:26 p.m. |
| 27 | September 18, 2001 | 10:52:17 p.m. |
| 28 | September 18, 2001 | 10:53:27 p.m. |
| 29 | September 18, 2001 | 11:20:10 p.m. |
| 30 | September 18, 2001 | 11:35:08 p.m. |
| 31 | September 19, 2001 | 12:30:00 a.m. |
| 32 | September 19, 2001 | 1:01:39 a.m. |

Calls one up to and including eighteen are the subject of the instant appeal. Although the subject of the charges in this case, calls nineteen through thirty-two were not sent to the jury because the trial judge granted defendant's motion for judgment of acquittal as to these charges.

Petitioner's name and number. When the police arrived, she handed her phone to Officer Chris Vance, who listened to the messages that Petitioner had left. Officer Vance testified that the messages contained threats that "if she [didn't] call him back, he [would] kill the kids." After being advised by the police that it was not safe for her to remain at home, Mrs. Triggs went to a friend's house. Officer Vance subsequently requested a warrant for Petitioner's arrest, which was issued late that afternoon. Petitioner continued to call Mrs. Triggs's phone and leave messages, making a total of fourteen calls that day.

On Monday morning, September 17, 2001, Mrs. Triggs met with the Fugitive Division of the Sheriff's Office to assist them in their efforts to find Petitioner. Petitioner made four calls to Mrs. Triggs on Monday.

On Tuesday, September 18, 2001, Petitioner made a total of twelve calls to Mrs. Triggs. At one point, he claimed he was giving one of their sons "Ambient," a sleeping pill. He also asked Mrs. Triggs, who is a nurse, "what does it mean when your respirations only get to one . . . when your breathing, respirations are only one a minute." He also threatened to "break [the children's] arms and their legs and then their neck." In another recorded call, he stated, "In about two hours I'm going to call you with an interstate number or an exit number off of 270 where I'm going to leave something for you, or somebody." In yet another recorded call, he told her that she was "down by one" child and "that will leave only two." He also told her that he was "getting a very itchy trigger finger." In still yet another recorded call, he said "Unfortunately, I don't care what [the] court orders, what laws or whatever you've got. It makes no difference to me . . . I'm either going to be dead or in jail, and that's fine with me."

At approximately nine or ten at night on September 18, while several sheriff's deputies waited with Mrs. Triggs at her home, Petitioner called and demanded that she meet him at a designated location. Petitioner said that Mrs. Triggs "had to

jump through hoops of fire to get to [her] kids and [her] first hoop was going to be this place, Good Time Auto." He told her to be at the auto shop by 11:00 p.m. Mrs. Triggs decided to meet him as he requested as part of a plan with the Sheriff's Office to locate Petitioner and the children.

Mrs. Triggs, however, did not meet Petitioner at the auto shop because the officers decided it was unsafe for her to do so because "the buildings were dark and there were two men standing outside." When she did not meet him there, he called again, after midnight. When Mrs. Triggs told Petitioner she was afraid of meeting him, he said, "I'm not going to kill you yet." Petitioner then told Mrs. Triggs that, waiting for her at Good Time Auto, were "four men . . . and they are there to rape you while I listen on the other phone to you scream." Mrs. Triggs then testified:

> He said that he was going to beat me, and he was going to torture me, and then he was going to rape me and then he would kill me, and then he was going to shove his cock in my mouth. And he said that if I didn't do it, he said I would never see my children while I was alive, he kept telling me, "Make no bones about it, you are dead tonight, you will die tonight, it's up to you whether or not you see your children before you do."

Petitioner then called again, telling Mrs. Triggs that he still wanted her to go to Good Time Auto. When she told him that she was in a "safe place," Petitioner became "very upset" and his voice went "flat." He then said, "Well, now you need to pick one." "Pick one child to die, it is time for another one to die, you need to pick one." Mrs. Triggs, who now was being encouraged by the deputies to continue talking with Petitioner because they had been able to trace his cell phone to Ocean City, said that she could not pick a child and tried to get him to talk about other things. Mrs. Triggs testified:

> He kept saying, "Oh, well, if you can't pick one, I will." And he got my daughter on the phone and she was kind of real sleepy, she is like, "Mommy?" And I am like, "Hi, baby." And she is like, "Mommy?" And I am like, "Are

you okay?" And he goes, "Uh, uh, uh, say goodbye to mommy forever." And I heard her scream.

Mrs. Triggs testified that she was so hysterical that she could not get back on the phone with Petitioner anymore. Petitioner called again, leaving a message. Sargent Maxwell Uy listened to the message and testified that Petitioner said, "I hope you know a good orthopaedic surgeon."

At this point, Petitioner had been located in Ocean City, and officers there were negotiating with him to try to get him to release the children. Petitioner was apprehended on September 19, 2001, and Mrs. Triggs's children were returned to her physically unharmed later that day.

During the period of September 16 to September 19, while Petitioner was calling Mrs. Triggs, he also called and threatened his mother, grandmother, sisters, and nieces and nephews, who, because they lived near Ocean City, were escorted to the police department for their own safety. While he was in jail for the second time awaiting trial, Petitioner sent numerous letters to his children and to his sister that contained disturbing references about Mrs. Triggs.[3]

## B. Procedural History

On October 18, 2001, Petitioner was indicted by the State on the following forty-three charges: one count of telephone misuse,[4] thirty counts of violating a protective

---

3. Mrs. Triggs was on good terms with Petitioner's sister, who showed her the letters. In one of his letters to his sister, Petitioner described, at length, his wife's appearance at a hearing ("that old hag librarian look is scary") and exhorted his sister to "take her to a hair stylist" and "help her out." In another letter, he enclosed a cartoon with the caption "I'm ... a menace to society." In yet another letter, he fantasized about having sex with his wife in the courtroom and signed the letter "her incubus." Using computers in the jail, he also discovered that Mrs. Triggs was employed at Georgetown Hospital as a nurse, a fact the State went to great lengths to keep confidential from Petitioner. In one of his letters to his sister, he enclosed a copy of an advertisement for Georgetown Hospital and stated, "Hide and seek was always fun to play."

4. Maryland Code, Art. 27, § 555A (1957, 1996 Rep. Vol.) provided:

order,[5] four counts of harassment,[6] and eight counts of telephone threats.[7] *See supra* note 2 for a chart of the calls that were charged.

---

It is unlawful for any person to make use of telephone facilities or equipment (1) for an anonymous call or calls if in a manner reasonably to be expected to annoy, abuse, torment, harass, or embarrass one or more persons; (2) for repeated calls, if with intent to annoy, abuse, torment, harass, or embarrass one or more persons; or (3) for any comment, request, suggestion or proposal which is obscene, lewd, lascivious, filthy, or indecent. Any person violating any one of the provisions of this section is guilty of a misdemeanor, and upon conviction thereof, shall be subject to a fine of not more than $500.00 or to imprisonment for not more than three (3) years, or both, in the discretion of the court.

This section was repealed in 2002. Section 3–804 of the Criminal Law Article (2002) presently includes provisions regarding regulation of telephone abuse.

5. At the time Petitioner was indicted, Section 4–509 of the Family Law Article provided in part:
(a) A person who fails to comply with the relief granted in an ex parte order under § 4–505(a)(2)(i), (ii), (iii), (iv), or (v) of this subtitle, or in a protective order under § 4–506(d)(1), (2), (3), (4), or (5) of this subtitle, is guilty of a misdemeanor and on conviction is subject, for each offense, to:
(1) for a first offense, a fine not exceeding $1,000 or imprisonment not exceeding 90 days or both; and
(2) for a second or subsequent offense, a fine not exceeding $2,500 or imprisonment not exceeding 1 year or both.

Maryland Code, § 4–509 of the Family Law Article (1984, 1999 Rep. Vol.).

6. Montgomery County Code, Chapter 32, § 19A provides:
(a) In this Section course of conduct means a persistent pattern of conduct of a series of acts over a period of time that shows a continuity of purpose.
(b) A person must not follow another person in or about a public place or intentionally engage in a course of conduct that alarms or seriously annoys another person:
(1) with intent to harass, alarm, or annoy the other person; and
(2) after reasonable warning or request to desist by or on behalf of the other person.
(c) This Section does not apply to any constitutionally protected conduct.
(d) A violation of this Section is a Class A violation. Each day that a person violates this Section is a separate offense.

7. Montgomery County Code, Chapter 32, § 19 provides:
If any person shall use obscene or indecent language or shall threaten any person with physical harm or shall make indecent proposals to any person by means of the telephone he shall be subject to punish-

During a pre-trial hearing, Judge Harrington of the Circuit Court for Montgomery County, heard, among other things, Petitioner's motion to strike duplicitous counts. Petitioner argued that the telephone misuse charge and the harassment charges were the same and that the thirty counts of violating a protective order were duplicitous because they constituted a course of conduct instead of "separate incidents." The court denied his motion, noting that the "State in its assertion has some technical or record procedure to identify each and every call, there is a time when a connection occurs, there is a time when a connection disconnects. . . . If it constitutes a violation of law, regardless of how brief it is, if it can be verified and proven, so be it."

Following a jury trial, Petitioner was convicted of thirty of the forty-three counts: one count of telephone misuse, four counts of harassment, seven counts of telephone threats, and eighteen counts of violating a protective order. At the sentencing hearing, conducted about two months after the trial, the court sentenced Petitioner to three-years imprisonment for the telephone misuse conviction, consecutive six month sentences for each of the harassment and telephone threat convictions, and consecutive one-year sentences totaling eighteen years for each violation of a protective order conviction. The sentences resulted in a term of imprisonment totaling twenty-six years and six months. When she imposed the sentence, Judge Harrington stated:

It is . . . extremely significant to me that these offenses occurred when you were already on probation for violating a protective order.

There is evidence before me that you have said that you have no regard for any court order that the Court might put in place and no regard for any law that might be enacted because you are simply not going to adhere to it.

---

ment for a class A violation as set forth in section 1–19 of chapter 1 of the County Code. Each day a violation continues to exist shall constitute a separate offense. This section shall apply with respect to any telephone communication either originating or received in the county, or both.

I don't know how you got the information as to where Ms. Triggs was now located but I think it's apparent in letters you sent even after being convicted of these offenses, that you had that information and you were using your knowledge of it when everybody had gone to great lengths on the State's side to try to keep you from knowing that, to further torment her with your ability to control where she goes and what she does even when you are confined. . . .

I think clearly there is an obsession there that nothing that the Court or the laws . . . have been able to dislodge. . . .

the concern for me in formulating a sentence in this case is really the aspect of protection, not rehabilitation, not general deterrence, but protection for the family involved in this particular case.

In an unreported opinion, the Court of Special Appeals vacated the sentences for harassment and telephone threats and affirmed the eighteen convictions and sentences for violating a protective order. With respect to the harassment and telephone threats, the court concluded that Petitioner was punished for the same conduct under Section 32–19A of the Montgomery County Code, regarding harassment, and Section 555A of Article 27 of the Maryland Code, regarding telephone threats. Applying *Miles v. State*, 349 Md. 215, 707 A.2d 841 (1998), the intermediate appellate court determined that the sentences for harassment and telephone threats merged under the rule of lenity because the county ordinance did not "clearly indicate an intent of cumulative punishment when the conduct also violated another statute." [8]

With respect to the eighteen counts of violating a protective order, the Court of Special Appeals observed that Section 4–509 of the Family Law Article provides penalties "for each offense" of violating a protective order. "Because each call

---

8. The State did not file a petition for writ of certiorari with respect to the Court of Special Appeals' holding regarding the sentences for harassment and telephone threats. We, thus, have not addressed this issue.

constituted a separate 'offense,'" the court affirmed Petitioner's eighteen convictions for violating a protective order.

We granted Petitioner's petition for a writ of certiorari, *Triggs v. State*, 379 Md. 225, 841 A.2d 340 (2004), which presented the following question for our review:

> Where Petitioner was convicted of harassing and threatening his wife, by telephone, over a period of two days, was it error to impose separate, one-year, consecutive sentences as to each of eighteen convictions under the Family Law statute?

Although Petitioner frames his question in terms of the multiple sentences only and does not address the multiple offenses and convictions, he maintained at oral argument, and the State likewise conceded this point, that his argument necessarily implicates what we have called the "unit of prosecution," which arises in the context of determining whether the charging of multiple offenses is appropriate. Our focus in this opinion, thus, is the unit of prosecution the General Assembly intended in order to trigger the penalty provisions for violating a protective order. When a protective order requires an abuser to have "no contact" with a victim, we conclude that repeated calls constitute separate acts and therefore separate offenses for the purposes of the sentencing provisions requiring penalties "for each offense" in Section 4–509 of the Family Law Article.

## II.   Standard of Review

When sentencing criminal defendants, "[i]t is well settled that '[a] judge is vested with very broad discretion.'" *Jackson v. State*, 364 Md. 192, 199, 772 A.2d 273, 277 (2001)(quoting *Poe v. State*, 341 Md. 523, 531, 671 A.2d 501, 505 (1996)). "The judge is accorded this broad latitude to best accomplish the objectives of sentencing—punishment, deterrence and rehabilitation." *Id.* at 199–200, 772 A.2d at 277 (quoting *State v. Dopkowski*, 325 Md. 671, 679, 602 A.2d 1185, 1189 (1992)). Maryland recognizes three grounds for appellate review of sentences: "(1) whether the sentence constitutes cruel and unusual punishment or violates other constitutional

requirements; (2) whether the sentencing judge was motivated by ill-will, prejudice or other impermissible considerations; and (3) whether the sentence is within statutory limits." *Id.* at 200, 772 A.2d at 277 (quoting *Gary v. State*, 341 Md. 513, 516, 671 A.2d 495, 496 (1996)); *see also Jennings v. State*, 339 Md. 675, 682–84, 664 A.2d 903, 907 (1995). In this case, in order to determine whether Petitioner's sentence was legal we must determine what unit of prosecution the Legislature intended when it established the crime of violating a protective order. We apply "our normal rules of statutory construction in determinating the legislative intent regarding the proper unit of prosecution and the appropriate unit of punishment in respect to violations of any criminal statute." *Melton v. State*, 379 Md. 471, 478, 842 A.2d 743, 747 (2004).

### III. Discussion

■ Petitioner does not maintain that his sentence is unconstitutional or that Judge Harrington was motivated by ill-will or prejudice; rather, he contends that it was error to impose separate, one-year sentences under the Family Law Article because the penalty provisions for violating a protective order under the statute are ambiguous. In such an instance, he maintains, merging the offenses is required under the rule of lenity, a rule of statutory construction that turns multiple offenses into a single course of conduct when it is uncertain as to whether the legislature intended multiple punishments for the same act or transaction.

Describing the calls as occurring in "flurries" or "clusters" because some of the calls occurred within minutes of each other, Petitioner also urges that the phone calls should be punished in the aggregate rather than as separate calls. He notes that, under the telephone misuse statute, "harassing or threatening telephone calls are punished in the aggregate." He maintains that the legislative history of the domestic violence statute, which includes the protective order procedure, reflects a focus on protecting victims from domestic abuse and "not on lengthy incarceration for each one in a flurry of telephone calls."

The State argues that the protective order statute is plain and unambiguous, noting that the statute states that a person who violates a protective order is subject to conviction and sentence, "for each offense." Because there is no ambiguity, the State maintains that the eighteen separate offenses do not merge under the rule of lenity.

If there is ambiguity in the statute, the State contends, separate sentences are permissible given the statute's legislative history. Because the purpose of the statute is to protect victims of domestic violence from further abuse, the State maintains that punishing an abuser for each call he makes in violation of the statute is appropriate.[9] The State also argues that treating separate calls as a "flurry" would undermine the purpose of the statute because such an interpretation would give an abuser a "pass" to "call ... 15, 20, 100 more times in the day and say whatever [he wants]."

## A.

Section 4–509 of the Family Law Article establishes the crime of violating a protective order:

(a) A person who fails to comply with the relief granted in an ex parte order under § 4–505(a)(2)(i), (ii), (iii), (iv), or (v) of this subtitle, or in a protective order under § 4–506(d)(1), (2), (3), (4), or (5) of this subtitle, is guilty of a misdemeanor and on conviction is subject, for each offense, to:

(1) for a first offense, a fine not exceeding $1,000 or imprisonment not exceeding 90 days or both; and

(2) for a second or subsequent offense, a fine not exceeding $2,500 or imprisonment not exceeding 1 year or both.

Code, § 4–509 of the Family Law Article.

Petitioner argues that the rule of lenity applies because it is not clear the General Assembly intended in Section 4–509 to

---

9. As we noted in *Coburn v. Coburn*, 342 Md. 244, 251 n. 3, 674 A.2d 951, 954 n. 3 (1996), although men can be victims of domestic abuse, women are the majority of victims in domestic violence cases. Although we shall use the pronoun "he" when referring to abusers, our interpretation of the domestic violence statute is gender-neutral, and we do not intend to ignore domestic abuse that occurs to male victims. *Id.*

allow courts to impose consecutive one-year sentences for violating a protective order when the violations consisted of separate calls occurring within relatively close periods of time. The issue in this case thus turns on whether repeated calls constitute separate acts for the purposes of the sentencing provisions requiring penalties "for each offense" in Section 4–509 of the Family Law Article.

In *Purnell v. State*, 375 Md. 678, 692, 827 A.2d 68, 76 (2003), we explained that determining whether the Legislature intended "multiple sentences for the same offense 'turn[s] on the unit of prosecution of the offense and this is ordinarily determined by reference to legislative intent.'" *See also Randall Book Corp. v. State*, 316 Md. 315, 323, 558 A.2d 715, 719–20 (1989)(explaining that, in cases involving multiple punishment, "cumulative sentences for the same offense may under some circumstances be imposed" when specifically authorized by the legislature). We analyze the unit of prosecution when we are faced with multiple punishments deriving from a single statutory provision. *Purnell*, 375 Md. at 692, 827 A.2d at 76. As we explained in *Purnell:*

> [W]hether a particular course of conduct constitutes one or more violations of a single statutory offense affects an accused in three distinct, albeit related ways: multiplicity in the indictment or information, multiple convictions for the same offense, and multiple sentences for the same offense. All three turn on the unit of prosecution of the offense and this is ordinarily determined by reference to legislative intent.

*Id.* (quoting *Brown v. State*, 311 Md. 426, 432, 535 A.2d 485, 488 (1988)). In other words, whether the defendant is challenging multiple indictments, multiple convictions, or multiple sentences, the unit of prosecution reflected in the statute controls whether multiple sentences ultimately may be imposed. "[A]mbiguous units of prosecution . . ., pursuant to the rule of lenity, must normally be construed in favor of the defendant," effectively merging the offenses. *Melton*, 379 Md.

at 488, 842 A.2d at 753 [10]; *Randall Book Corp.*, 316 Md. at 327, 558 A.2d at 721.

Thus, in order to determine the unit of prosecution, "a critical question is one of legislative intent." *Randall Book,* 316 Md. at 324, 558 A.2d at 720; *State v. Boozer,* 304 Md. 98, 106, 497 A.2d 1129, 1133 (1985)(stating that "the classic test . . . is whether the legislative intent is to punish individual acts separately or to punish only the course of action which they constitute")(quoting *State v. Frazier,* 185 Conn. 211, 440 A.2d 916, 925 (1981), *cert. denied,* 458 U.S. 1112, 102 S.Ct. 3496, 73 L.Ed.2d 1375 (1982)). As we have explained many times, when discerning legislative intent, "we look first to the language of the statute, read in light of the full context of the statute and other external manifestations of intent or general purpose." *Jones v. State,* 357 Md. 141, 159, 742 A.2d 493, 502 (1999). "[W]hen the language is clear and unambiguous, our inquiry ordinarily ends there." *Drew v. First Guar. Mortgage Corp.,* 379 Md. 318, 327, 842 A.2d 1, 6 (2003). Reading the statutory language within the context of the statutory scheme, our approach is a "commonsensical" one designed to effectuate

---

**10.** Generally, the "required evidence test" or *"Blockburger"* test applies when a defendant argues that two or more offenses stem from the same act or course of conduct. *Purnell,* 375 Md. at 692, 827 A.2d at 77. In *Purnell,* we explained:

> The required evidence test is that which is minimally necessary to secure a conviction for each . . . offense. If each offense requires a proof of a fact which the other does not, or in other words, if each offense contains an element which the other does not, the offenses are not the same for double jeopardy and merger purposes, even though arising from the same conduct or episode.

375 Md. at 694, 827 A.2d at 77 (quoting *Williams v. State,* 323 Md. 312, 317–18, 593 A.2d 671, 673 (1991)). "When there is a merger under the required evidence test, separate sentences are normally precluded." *State v. Lancaster,* 332 Md. 385, 392, 631 A.2d 453, 457 (1993). Here, the separate offenses of violating a protective order for which Petitioner was convicted would not have merged under the required evidence test. Because Petitioner made separate phone calls at different times, the State had to prove each separate call and time in order to prove that he made each call in violation of the protective order. Thus, although Petitioner refers to the required evidence test in his argument, the required evidence test would not preclude separate sentences for separate offenses under the circumstances of this case.

the "purpose, aim, or policy of the enacting body." *Id.* at 327–28, 842 A.2d at 6–7. "Remedial statutes," furthermore, "are to be liberally construed to 'suppress the evil and advance the remedy.'" *Coburn v. Coburn,* 342 Md. 244, 256, 674 A.2d 951, 957 (1996)(providing a history of the domestic violence statute and determining that it is a remedial statute).[11]

## B.

The Maryland General Assembly first enacted the domestic violence statute in 1980. *See* 1980 Md. Laws, ch. 887; *see also Coburn,* 342 Md. at 252–56, 674 A.2d at 955–57 (providing a history of the domestic violence statute and a detailed explanation of how to file for a protective order); Richard A. DuBose III, Comment, *Katsenelenbogen v. Katsenelenbogen: Through the Eyes of the Victim—Maryland's Civil Protection Order and the Role of the Court,* 32 U. BALT. L.REV. 237 (2003)(describing Maryland's domestic violence law). In 1992, Maryland's domestic violence laws were strengthened. *See* 1992 Md. Laws, ch. 65.[12] The 1992 changes included extending the

---

11. Although the domestic violence statute is a remedial one,

the Legislature has not excused the perpetrators of domestic violence from the reach of the criminal law. They are subject to prosecution for their conduct—for assault, rape, and other sexual offenses, criminal homicide, kidnaping—and, indeed, for failing to comply with relief provided in a protective order.

*Katsenelenbogen v. Katsenelenbogen,* 365 Md. 122, 134 n. 2, 775 A.2d 1249, 1256 n. 2 (2001)(citing Family Law Article, Section 4–509(a)).

12. The purpose clause for Senate Bill 282, which was enacted in 1992, provides:

For the purpose of altering the length of time that an ex parte order or protective order issued in a domestic violence case may be effective; altering the contents of a petition filed in a domestic violence case; providing that certain information may be omitted from certain documents filed in domestic violence cases; clarifying a certain finding that shall be made before a court may issue an ex parte order or protective order and protective order; altering the types of relief that may be granted in an ex parte order; providing for the modification of certain orders; altering certain provisions relating to the enforcement of an ex parte order or protective order; prohibiting a person from violating certain provisions of certain orders; establishing certain penalties for certain violations; providing for certain

period of relief from 30 to 200 days, expanding the definition of abuse, expanding the definition of household members eligible for relief, adding forms of relief the court may order such as prohibiting contact between the parties, changing the standard of proof from a preponderance of the evidence to clear and convincing evidence, granting courts the ability to modify a protective order, and establishing penalties "for each offense" of violating a protective order. *Id.* The legislative bill file includes numerous documents from newspaper articles to testimony from representatives from the Governor's Office revealing the overarching purpose to strengthen the law and protect victims of domestic abuse. *See, e.g.,* Letter from Senator Barbara Hoffman, The Women Legislators of Maryland, to the House Judiciary Committee (March 20, 1992)(on file with the Department of Legislative Services); Bonnie A. Kirkland, Deputy Legislative Officer for the Office of the Governor, Briefing Document for Senate Bill 282 before the Senate Judicial Proceedings Committee and House Judiciary Committee; Betha Hill, *Violence Against Women: Schaefer wants to Expand Md. Law's Protections,* WASH. POST, Feb. 10, 1992, at D1.

The General Assembly has continued to strengthen the domestic violence statute. In 1994, for example, the General Assembly added a provision allowing a police officer to arrest an abuser without a warrant. 1994 Md. Laws, ch. 728. In 1995, the General Assembly allowed the court to waive filing fees for the issuance of a temporary ex parte order or a protective order. 1995 Md. Laws, ch. 9. In 1996, the General Assembly provided that a law enforcement officer may remove a firearm from a domestic violence scene. 1996 Md. Laws, ch. 561. In 1997, the General Assembly increased the available relief period that may be granted from 200 days to 12 months. 1997 Md. Laws, ch. 307.

petitions for modifications and appeals; providing that certain orders or decisions or compliance with certain orders may not be admissible or considered in certain divorce proceedings; defining certain terms; altering certain definitions; and generally relating to domestic violence cases.

In 1998, the General Assembly increased the fine for violating a protective order from $500 to $1000 and adopted separate penalties for the first violation and second and subsequent violations. 1998 Md. Laws, ch. 685. When the 1998 legislation was first proposed, House Bill 339 read:

(a) A person who fails to comply with the relief granted in ... a protective order ... is guilty of a misdemeanor and on conviction is subject, for each offense, to a fine not exceeding $10,000 or imprisonment not exceeding 3 years.

According to the House Floor Report, one of the purposes of the bill was to make violating a protective order an offense "over which the District Court has concurrent jurisdiction with the circuit court." The report also notes that, because the terms of imprisonment would be increased, the defendant would have a right to demand a jury trial. Floor Report, H.B. 339 (1998). In addition, "the proposed increases in the maximum penalties are designed to deter potential violations of an ex parte or protective order." The purpose of the law was described initially as "increasing the amount of the fine and the term of imprisonment."

House Bill 339 was amended, however, in a way that established multiple penalties for each offense of violating a protective order. 1998 Md. Laws, ch. 685. The capped fine of $10,000 and maximum punishment of three years was changed to an approach that more clearly penalized the abuser for each offense. After the amendment, Section 4–509 established the current penalty scheme:

(a) A person who fails to comply with the relief granted in ... a protective order ... is guilty of a misdemeanor and on conviction is subject, for each offense, to:

(1) *for a first offense,* a fine not exceeding $1,000 or imprisonment not exceeding 90 days or both; and

(2) *for a second or subsequent offense,* a fine not exceeding $2,500 or imprisonment not exceeding 1 year or both.

1998 Md. Laws, ch. 685 (emphasis added). Finally, the Revised Fiscal Note for House Bill 339 stated that "[t]his amended bill increases the penalties for violation of a domestic

violence order." The note also observed that "[g]eneral fund revenues could increase or decrease under the bill's alteration of the monetary penalty provision, depending upon the number of convictions and fines imposed. . . ." Revised Fiscal Note, H.B. 339 (1998).

Our exploration of Section 4–509 reveals that the provision unambiguously provides that a person who violates a protective order may receive cumulative penalties for separate offenses. Not only does the statute use the phrase "for each offense," it also establishes subsequent penalties based on the number of times an abuser violates a protective order. Section 4–509 plainly and unambiguously contemplates that a person may be subject to multiple convictions for the multiple offenses of violating a single protective order.

Section 4–509, however, does not define what an "offense" consists of under the Family Law Article. Section 4–506(d), however, of the Family Law Article provides what kind of relief may be included in a final protective order.[13] In order

---

13.  Under Section 4–506(d) of the Family Law Article, a court may:

(1) order the respondent to refrain from abusing or threatening to abuse any person eligible for relief;

(2) order the respondent to refrain from contacting, attempting to contact, or harassing any person eligible for relief;

(3) order the respondent to refrain from entering the residence of any person eligible for relief;

(4) . . . order the respondent to vacate the home immediately and award temporary use and possession of the home to the person eligible for relief . . . ;

(5) order the respondent to remain away from the place of employment, school, or temporary residence of a person eligible for relief or home of other family members;

(6) award temporary custody of a minor child of the respondent and a person eligible for relief;

(7) establish temporary visitation with a minor child . . . ;

(8) award emergency family maintenance . . . ;

(9) award temporary use and possession of a vehicle jointly owned by the respondent and a person eligible for relief . . . ;

(10) direct the respondent or any or all of the persons eligible for relief to participate in professionally supervised counseling or a domestic violence program;

(11) order the respondent to surrender to law enforcement authorities any firearm in the respondent's possession for the duration of the protective order; or

to determine whether an offense has been committed in violation of a protective order, a court must review what the protective order required. *See Coburn,* 342 Md. at 254, 674 A.2d at 956 (describing the process for petitioning for a protective order and the different types of relief a court may order). For example, a court may order, among other things, an abuser to stay away from the victim and to have no contact with that victim.

In this case, after amending the September 26 protective order, the court ordered that Petitioner have "no contact" with Mrs. Triggs *"in person or by any other manner,* including contact at her residence, place of employment [and the like]" (emphasis added). Additionally, in order to ensure that Petitioner not contact Mrs. Triggs, the court required him to pick up and drop off his children at school, rather than at home, when he had them for visitation every two weeks. The court also designated Mrs. Triggs's father to serve as an intermediary between Mrs. Triggs and Petitioner should Petitioner need to "relay messages" to Mrs. Triggs in case of an emergency. Finally, the court required the children to call their father twice a week instead of permitting Petitioner to call them. Pursuant to Section 4–506, therefore, Petitioner clearly was ordered to have no contact whatsoever with Mrs. Triggs.

We have no difficulty concluding that each call constituted prohibited contact and, thus, was a separate and distinct "offense" for the purposes of the penalty provisions in Section 4–509. As our review of the domestic violence statute's legislative history indicates, the Maryland domestic violence statute reveals a strong legislative intent to protect victims. *See Coburn,* 342 Md. at 252, 674 A.2d at 955 (explaining that the purpose of the domestic violence statute more generally "is to protect and 'aid victims of domestic abuse by providing an immediate and effective remedy' ")(quoting *Barbee v. Barbee,*

---

(12) order the respondent to pay filing fees and costs of a proceeding under this subtitle.
Maryland Code, § 4–506(d) of the Family Law Article (1984, 1999 Rep. Vol).

311 Md. 620, 623, 537 A.2d 224, 225 (1988)). In fact, when we construe the statutory language authorizing protective orders within the context of the domestic violence statute's overall scheme, we discern a clear legislative intent to define each incident of domestic violence as a separate and punishable act. In Section 4–501, for example, "abuse" under the domestic violence statute is defined as "*any* of the following acts":

(i) an *act* that causes serious bodily harm;

(ii) an *act* that places a person eligible for relief in fear of imminent serious bodily harm;

(iii) assault in any degree;

(iv) rape or sexual offense as defined by Article 27, §§ 462 through 464C of the Code or attempted rape or sexual offense in any degree; or

(v) false imprisonment.

Maryland Code, § 4–501 of the Family Law Article (1984, 1999 Rep. Vol.)(emphasis added). In *Richmond v. State,* 326 Md. 257, 265, 604 A.2d 483, 487 (1992), we explained that "[w]e have ... construed the use of the word 'any' in a criminal statute to mean 'every' and to support a legislative intent authorizing multiple convictions." As it thus takes only one act under Section 4–501 to constitute abuse under the domestic violence statute in order for a court to issue a protective order, *see Katsenelenbogen,* 365 Md. at 134–35, 775 A.2d at 1256–57 (upholding a trial court's decision that one instance of shoving constituted "abuse" under the act in order to issue a protective order), it follows that it should take only one act, such as a telephone call, to constitute an "offense" in violation of a protective order under Section 4–509, particularly given that the provision mandates penalties "for *each* offense" and authorizes multiple convictions. Such an approach is not only logically sound but is also consistent with the statute's overall scheme to protect victims of domestic violence. By holding that each separate call constitutes contact in violation of a protective order, we are effectuating the purpose of the domestic violence statute, a statute clearly designed to prevent abuse and protect victims of domestic violence.

In *State v. McGee*, 135 N.M. 73, 84 P.3d 690, 693 (2003), the Court of Appeals of New Mexico concluded that each phone call constituted a separate instance of prohibited contact in violation of a protective order. In *McGee*, the defendant received six consecutive sentences for four violations of a protective order on February 16, 2000, and two other violations occurring on October 2, 2000. *Id.* at 695. Arguing that he engaged in "a single course of conduct" on two occasions when he made calls in violation of a protective order on two days, the defendant, further, argued he should be "sentenced once for each course of conduct." *Id.* The New Mexico intermediate appellate court disagreed, observing that "the order of protection clearly and unambiguously ordered Defendant not to 'contact' Victim" and that "[t]he legislature has made its intent clear that each violation will be punished separately.'" *Id.* at 696. Notably, the court reached this conclusion based on penalty language that arguably is less clear than Maryland's penalty provision, which, unlike the New Mexico statute, clearly mandates penalties "for each offense." [14]

Similarly, in *Walker v. Walker*, the Court of Appeals of New York concluded that separate and consecutive sentences could be imposed for "each separate and distinct" violation of a protective order. 86 N.Y.2d 624, 635 N.Y.S.2d 152, 658 N.E.2d 1025, 1026, (1995).[15] In *Walker*, while he was jailed,

---

14. N.M. Stat. Ann. § 40–13–6 E (Michie 1978, 1999 Repl. Pamphlet) provides:

> A person convicted of violating an order of protection granted by a court under the Family Violence Protection Act is guilty of a misdemeanor and shall be sentenced in accordance with Section 31–19–1 NMSA 1978. Upon a second or subsequent conviction, an offender shall be sentenced to a jail term of not less than seventy-two consecutive hours that shall not be suspended, deferred or taken under advisement.

15. In support of his argument, Petitioner cites *Vitti v. Vitti*, 202 A.D.2d 917, 609 N.Y.S.2d 686 (N.Y.App.Div.1994), a New York case holding that, where a husband made a series of phone calls in violation of a protective order, two consecutive six-month incarcerations were not valid under the Family Court Act because the Act, on its face, prohibited consecutive sentences. *Id.* at 688. In *Carmille A. v. David A.,* 162

the defendant sent three written communications to his wife in violation of a protective order requiring that he have no contact with his wife. *Id.* The Family Court sentenced him to three consecutive six-month incarcerations, one for each violation of the protective order.[16] Rejecting the defendant's argument that the statute penalizing the violation of a protective order "allow[ed] a maximum of six months' incarceration only, regardless of the number of willful acts of disobedience against the same order," the Court of Appeals observed that, under the defendant's argument:

> [A] violator already penalized for willfully failing to obey an order of protection would garner immunity from further official sanction for persistent, separate violations. Such an approach is in no way compelled or warranted by the governing statutes, sentencing principles or reasonable statutory analysis. Its incongruous and untenable result would also constitute an invitation to violate and no incentive to obey.

*Id.* at 1027 (citation omitted). The court went on to observe that the fact that the defendant "disobeyed the court's order from jail serves only to underscore the need for an effective judicial option for appropriate punishment and deterrence." *Id.* Without strict enforcement, in the court's view, the "core purpose" of the domestic violence statute to protect victims of domestic violence would be frustrated. *Id.*

---

Misc.2d 22, 615 N.Y.S.2d 584, 587 (N.Y.Fam.Ct.1994), the New York Family Court declined to follow *Vitti*, holding instead that "[t]he plain reading of [the Family Court Act] discloses that for each separate finding of violation, for each separate failure to obey the order of protection, a guilty respondent may be committed to jail for a term not to exceed six months." *Id.* at 590. In *Walker*, the case we discuss above, the New York Court of Appeals cites *Carmille A.* with approval, adopting its holding that each separate finding of a violation may result in separate punishments. 635 N.Y.S.2d 152, 658 N.E.2d at 1027.

**16.** Section 846–a of the New York Family Court Act provides that:

If a respondent is brought before the court for failure to obey any lawful order issued under this article ... and if, after hearing, the court is satisfied by competent proof that the respondent has willfully failed to obey any such order, the court ... may commit the respondent to jail for a term not to exceed six months.

We also expressly reject Petitioner's argument that the statute anticipates that a "single course of conduct" such as a "flurry" of calls occurring within seconds or minutes of each other should be treated as one offense under the rule of lenity. We first observe that Petitioner's contention that he was just pressing the redial button is somewhat disingenuous. Although some of the calls for which he was convicted were separated by a minute or minutes, *see supra* note 2, many of the calls were separated by more than twenty minutes. In fact, in the first call he made to his wife, Petitioner's statement—"I don't give a fuck about a piece of paper"—indicates he was doing much more than passively pressing redial: he was intentionally and deliberately contacting his wife.

Moreover, we reject the implication underlying Petitioner's "flurry" argument that somehow the repeated calls were less violative of the protective order precisely because there were so many of them and because some of them occurred close in time to each other. In fact, as we stated in *Boozer*:

> The courts of this country have had little difficulty in concluding that separate acts resulting in separate insults to the person of the victim may be separately charged and punished even though they occur in close proximity to each other and even though they are part of a single criminal episode or transaction.

*Id.* at 105, 497 A.2d at 1132 (determining that a defendant may be subject to multiple charges arising out of the same criminal sexual course of conduct); *see also Harrell v. State,* 88 Wis.2d 546, 277 N.W.2d 462, 464–69 (1979)(concluding that, where a defendant was convicted of two counts of rape when twenty-five minutes transpired between acts of sexual intercourse, each act was "analytically separated by considerations of fact and time" and noting that "[e]ach act [was] a further denigration of the victim's integrity"). As the Court of Appeals of New York observed, if "a violator [of a protective order] already penalized for willfully failing to obey an order of protection would garner immunity from further official sanction for persistent, separate violations," the result would be "an invitation to violate and no incentive to obey." *Walker,*

635 N.Y.S.2d 152, 658 N.E.2d at 1027. Because we believe the General Assembly created a penalty scheme in Section 4–509 to give abusers a disincentive to violate protective orders, we reject Petitioner's "flurry" argument for this reason as well.

## IV. Conclusion

We conclude that repeated calls constitute separate acts for the purposes of the sentencing provisions requiring penalties "for each offense" in Section 4–509 of the Family Law Article. In this case, Petitioner received eighteen sentences because he willfully and deliberately flouted an order of protection eighteen times by making eighteen calls in violation of a protective order requiring that he have no contact with Mrs. Triggs. Judge Harrington did not err because Petitioner was convicted of eighteen distinct offenses and because the eighteen sentences Petitioner received were authorized by the penalty provisions of the domestic violence statute.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.*