855 A.2d 1175

**Afaf N. KHALIFA**

v.

**STATE of Maryland.**

**No. 133, Sept. Term, 2003.**

Court of Appeals of Maryland.

Aug. 3, 2004.

402

■■■■■■■

William C. Brennan, Jr. (Brenna, Trainor, Billman & Bennett, LLP, Upper Marlboro, on brief), for petitioner.

Gary E. Bair, Solicitor General (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, J.

We granted Afaf N. Khalifa's petition for a writ of certiorari to review her multiple convictions and sentences of incarceration for violating former Maryland Code, Section 9–305 of the Family Law Article (1984, 1999 Repl.Vol.)[1] as well as the current, amended version of that statute, Section 9–305 of the Family Law Article (1984, 1999 Repl.Vol., 2002 Supp.).[2] The

---

**1.** Former Section 9–305 of the Family Law Article (1984, 1999 Repl. Vol.) stated:

> If a child is under the age of 16 years, a relative who knows that another person is the lawful custodian of the child may not:
>
> (1) abduct, take, or carry away the child from the lawful custodian to a place outside of this State;
>
> (2) having acquired lawful possession of the child, detain the child outside of this State for more than 48 hours after the lawful custodian demands that the child be returned;
>
> (3) harbor or hide the child outside of this State knowing that possession of the child was obtained by another relative in violation of this section; or
>
> (4) act as an accessory to an act prohibited by this section.

**2.** Amended Section 9–305 of the Family Law Article (1984, 1999 Repl.Vol., 2002 Supp.) states:

> (a) *In general.*—If a child is under the age of 16 years, a relative who knows that another person is the lawful custodian of the child may not:
>
> (1) abduct, take, or carry away the child from the lawful custodian to a place in another state;
>
> (2) having acquired lawful possession of the child, detain the child in another state for more than 48 hours after the lawful custodian demands that the child be returned;

convictions arose from Khalifa's role in the abduction and detention of her grandson, Adam Shannon, who was born in the United States and now resides in Egypt, thousands of miles away from his father and lawful custodian, Michael Shannon. Khalifa challenges her convictions and sentences on three grounds: (1) courts in the State of Maryland lacked territorial jurisdiction to hear the prosecution of certain counts against her; (2) her convictions and sentences violate the *Ex Post Facto* Clauses of the United States Constitution and Maryland Declaration of Rights; and (3) her multiple sentences are "constitutionally defective" because the indictment charged the same offense in multiple counts.

## I. Background

Khalifa (hereinafter "Petitioner") and her adult daughter, Nermeen Khalifa Shannon (hereinafter "Nermeen"), are citizens of Egypt, where Nermeen was raised and educated. In 1989, upon reaching the age of 21, Nermeen moved to the United States and settled in Maryland. In July of 1995, while living in Maryland, Nermeen met Michael Shannon, and, on

---

(3) harbor or hide the child in another state knowing that possession of the child was obtained by another relative in violation of this section; or

(4) act as an accessory to an act prohibited by this section.

(b) *Additional restrictions.*—If a child is under the age of 16 years, a relative who knows that another person is the lawful custodian of the child may not:

(1) abduct, take or carry away the child from the lawful custodian to a place that is outside of the United States or a territory of the United States or the District of Columbia or the Commonwealth of Puerto Rico;

(2) having acquired lawful possession of the child, detain the child in a place that is outside the United States or a territory of the United States or the District of Columbia or the Commonwealth of Puerto Rico for more than 48 hours after the lawful custodian demands that the child be returned;

(3) harbor or hide the child in a place that is outside of the United States or a territory of the United States or the District of Columbia or the Commonwealth of Puerto Rico knowing that possession of the child was obtained by another relative in violation of this section; or

(4) act as an accessory to an act prohibited by this section.

March 3, 1996, the two were married and took up residence in Millersville in Anne Arundel County.

On February 9, 1997, Nermeen gave birth to their first son, Adam Shannon. Nermeen and Michael separated in January of 2000, and Nermeen moved to an apartment in Baltimore County. As a result of attempts to reconcile several months later, their second child, Jason Shannon, was born on January 10, 2001. Nermeen and Michael's reconciliation attempts ended in February of 2001.

On February 27, 2001, the Circuit Court for Anne Arundel County issued a "Consent Order" granting to Michael "legal and primary physical care and custody" of Adam. Under the order, Nermeen was afforded visitation with Adam, including up to three non-consecutive weeks of unsupervised visitation during the months of June, July, and August. The order also granted to Nermeen "legal and primary physical care and custody" of Jason, with whom Michael had "reasonable rights of visitation."

On August 18, 2001, Petitioner arrived in the United States from Egypt and stayed at Nermeen's Baltimore County apartment. Petitioner, who allegedly had a copy of the custody order, asked Michael if Nermeen's week of unsupervised visitation with Adam could correspond with Petitioner's visit to the United States. Petitioner explained to Michael that she wanted to take Nermeen, Adam, and Jason to New York to visit a relative, Waeil El Bayar, whose wife had recently given birth. Michael agreed, with the specific condition that Adam and Jason return to Maryland on Sunday, August 26. According to Michael, Petitioner promised to return the children to Nermeen's apartment by 6:00 p.m., Sunday, August 26.

Nermeen's neighbor and babysitter, Christa Mayo, stated that she last babysat Nermeen's children on Thursday, August 23, 2001. Nermeen had told Christa that she no longer needed babysitting services because she was moving to Egypt with the financial and logistical support of Petitioner. Nermeen explained to Christa that the move was a secret because "[t]hey had an upcoming court case regarding custody [and]

that she wanted to leave before that and no one was to know that they were going." About a month earlier, at Nermeen's request, Christa had taken Adam to have his passport photograph taken.

On August 23 and for a short time on August 24, Christa saw a moving truck outside of Nermeen's apartment, and she observed Petitioner "directing the movers" as they walked in and out of the apartment. According to Christa, Petitioner seemed "very dominant" and "in control," and, when she was with her daughter, Petitioner appeared "in charge." Another of Nermeen's neighbors, Lynda Leight, who observed Petitioner on August 24, noted that Petitioner "seemed to be very forceful" and "dominant" in the way she interacted with Nermeen. The property manager, Michael Nabors, observed the moving truck outside of Nermeen's apartment on August 24 and had a similar impression of Petitioner, recalling that she "was telling the [movers] what they should and shouldn't be doing in the truck."

When Christa encountered Nermeen outside of her apartment on August 24, Nermeen gave Christa her apartment keys to return to the rental office after Christa had taken whatever she wanted of the items left behind in Nermeen's apartment.

Petitioner, Nermeen, Adam, and Jason arrived at El Bayar's house in New York on Friday, August 24. According to El Bayar, after spending one night at his house, his visitors, on August 25, traveled to the airport in a rented car and, using airline tickets that El Bayar had purchased for them at Nermeen's request several days earlier, flew to Egypt.

Before leaving Maryland, Nermeen provided Michael with three telephone numbers to reach her and the children while they were in New York. On August 24, Michael called New York and spoke with Petitioner, Nermeen, and Adam. Michael called New York again on August 25 and spoke with Nermeen and Adam. On August 26, however, the day Michael expected the children to return to Maryland, Michael was unable to

reach Nermeen and the children at any of the telephone numbers he was provided.

At around 4:00 p.m. that day, Michael drove to Nermeen's apartment and found that it "had been cleaned out." He noticed that the "major furniture," the boys' clothes, the entertainment center, and the television were missing. Michael immediately called the police, who described him as "extremely distraught" and "nearly hysterical."

On Tuesday, August 28, Michael called Petitioner's residence in Cairo, Egypt, and Petitioner answered the phone. Petitioner informed Michael that Adam and Jason were with her and that Nermeen was elsewhere in Egypt under a doctor's care. Petitioner initially did not allow Michael to speak with Adam. When Michael specifically requested the return of the children, Petitioner refused and stated that they would be back in a couple of weeks. Petitioner, according to Michael, explained that she had not told Michael of the children's travel to Egypt because, had he known, he would have stopped them or had them arrested. Later that day, Michael again called Petitioner's number in Egypt and was able to speak to Adam. Although Michael has spoken with Adam by phone consistently, Michael has not seen his oldest son since Adam left the United States.

While Adam and Jason have lived in Egypt, officials from the United States Embassy there have conducted three "welfare and whereabouts" visits of the boys at Petitioner's residence in Cairo. During the first visit on October 2, 2001, Petitioner, her husband, Nermeen, Adam, and Jason were present. On February 27, 2002, when the embassy officials conducted the second visit, the children were accompanied by Nermeen and her sister. On the third visit, which took place on August 7, 2002, Nermeen was with her children and, this time, joined by her sister and niece. During all of the visits, the children appeared to the embassy officials to be living at Petitioner's home in Cairo.

In the evening of August 28, 2001, the District Court of Maryland sitting in Anne Arundel County issued a warrant for

the arrest of Petitioner and charged her with child abduction and accessory to child abduction of Adam in violation of Section 9–305 of the Family Law Article (1984, 1999 Repl. Vol.). The Circuit Court for Anne Arundel County, on August 29, 2001, ordered Nermeen to "immediately return" Adam "to the care and custody of Michael Shannon." On September 11, 2001, the circuit court granted the "sole legal and physical care and custody" of Jason to Michael and ordered Nermeen to "immediately return" him to his father.

Petitioner was arrested in May of 2002, when she returned to the United States with her husband to visit their property in San Diego, California. In August of 2002, the State of Maryland issued a revised criminal indictment, charging Petitioner with fifteen counts—ten counts of violating Maryland Code, Section 9–305 of the Family Law Article and five counts of conspiracy to violate that statute. All of the counts related to Petitioner's role in the alleged abduction, detention, and harboring of Adam. Because amendments to Section 9–305 and the related penalty provisions of Section 9–307 became effective on October 1, 2001, the State charged Petitioner in separate counts for conduct occurring before and after that date. In particular, of the ten Counts alleging violations of Section 9–305, Counts 1 through 6 charged Petitioner for conduct occurring between August and September of 2001. Counts 11 through 13, alleging conspiracy, also charged Petitioner for conduct that took place between August and September of 2001. The balance of the charges (Counts 7 though 10 and Counts 14 through 15) alleged that Petitioner committed offenses after October 2001.[3]

---

**3.** The fifteen counts alleged in the indictment were:

Count 1: August 2001, abduct a child outside of this State.
Count 2: August through September 2001, detain a child outside of this State.
Count 3: August through September 2001, harbor child outside of this State.
Count 4: August 2001, accessory to abduct a child outside of this State.
Count 5: August 2001 through September 2001, accessory to detain a child outside of this State.

After waiving her right to jury trial, Petitioner was tried in the Circuit Court for Anne Arundel County before the Honorable Nancy Davis–Loomis. Judge Davis–Loomis presided over the four-day trial and, on January 21, 2003, found Petitioner guilty on ten counts and rendered the following verdicts:

Count 3: August 2001 through September 2001, harbor child outside of this State—Guilty

Count 4: August 2001 through September 2001, accessory to abduct child outside of this State—Guilty

Count 5: August 2001 through September 2001, accessory to detain child outside of this State—Guilty.

Count 8: October 2001 through May 2002, harbor child outside of the United States—Guilty.

Count 9: October 2001 through May 2002, accessory to detain child outside of the United States—Guilty.

Count 11: August 2001, conspire to commit child abduction outside of this State—Guilty.

Count 12: August 2001 through September 2001, conspire to commit detaining child outside of this State—Guilty.

---

Count 6: August 2001 through September 2001, accessory to harbor a child outside of this State.

Count 7: October 2001 through May 2002, detain a child outside of the United States.

Count 8: October 2001 through May 2002, harbor a child outside of the United States.

Count 9: October 2001 through May 2002, accessory to harbor a child outside of the United States.

Count 10: October 2001 through May 2002, accessory to harbor a child outside of the United States.

Count 11: August 2001, conspire to commit child abduction outside of this State

Count 12: August 2001 through September 2001, conspire to commit detaining a child outside of this State.

Count 13: August 2001 through September 2001, conspire to commit harboring of a child outside of this State.

Count 14: October 2001 through May 2002, conspire to commit detaining a child outside of the United States.

Count 15: October 2001 through May 2002, conspire to commit harboring a child outside of the United States.

Count 13: August 2001 through September 2001 conspire to commit harboring child outside of this State—Guilty.

Count 14: October 2001 through May 2002, conspire to commit detaining child outside of the United States—Guilty.

Count 15: October 2001 through May 2002, conspire to commit harboring child outside of the United States—Guilty.

For purposes of sentencing, Judge Davis–Loomis merged Count 3 into Count 5, Count 8 into Count 9, Count 13 into Count 12, and Count 15 into Count 14. She imposed a $15,000 fine and a total of ten years of imprisonment, divided among the various counts as follows: one year of imprisonment on Count 4 (accessory to child abduction outside this State); one year consecutive on Count 5 (accessory to detain a child outside of this State); three years consecutive on Count 9 (accessory to detain a child outside of the United States); one year consecutive on Count 11 (conspiracy to abduct); one year consecutive on Count 12 (conspiracy to detain outside this State); and three years consecutive on Count 14 (conspiracy to detain outside of the United States). A three-judge sentence review panel decreased Petitioner's fine to $5,000 and, by ordering her sentences of imprisonment to run concurrently instead of consecutively, limited the total prison sentence to three years.

The Court of Special Appeals, in an unreported opinion, merged all of the conspiracy counts but otherwise affirmed Petitioner's remaining convictions and sentences. The court held that Anne Arundel County had territorial jurisdiction to prosecute the alleged harboring and detention of Adam because those acts "deprived Michael in Maryland of custody of his son, which was an essential element of the crimes of harboring and detaining a child." The court further held that Petitioner's convictions under the "new" Section 9–305 did not violate the *Ex Post Facto* Clauses of the United States Constitution and the Maryland Declaration of Rights. Petitioner's offenses, in the court's view, were "continuing in nature and

punishable 'day by day.' " According to the court, if the Petitioner had detained Adam outside of the United States after October 1, 2001, the effective date of the statute, she violated the provisions of that statute, and "the State could prosecute her accordingly." With respect to Petitioner's claim that the indictment was multiplicative, the Court of Special Appeals decided against merging her sentences for accessory to abduction, accessory to detain outside of Maryland, and accessory to detain outside the United States. As the court reasoned, "[a]bduction differs from detention in that it includes the element of taking, and the two detention charges differ from one another in their requisite place of detention." The court also decided, however, upon the State's concession, that all of the sentences for conspiracy do merge, recognizing that "only one sentence can be imposed for a single common law conspiracy no matter how many criminal acts the conspirators have agreed to commit." The court held that, because "the offense carrying the lesser maximum penalty merges into the offense carrying the greater penalty," the one-year sentences under Counts 11 and 12 merged into Count 14, which carried a three-year sentence.[4]

As a result of the all of the proceedings below, Petitioner had convictions with concurrent sentences on four counts: one year of imprisonment on Count 4 (accessory to child abduction outside of this State); one year on Count 5 (accessory to detain a child outside of this State); three years on Count 9 (accessory to detain a child outside of the United States); and three years on Count 14 (conspiracy to detain a child outside of the United States). Contesting the constitutionality and lawfulness of these convictions and sentences, Petitioner filed a petition for a writ of certiorari, which we granted, *Khalifa v. State,* 380 Md. 230, 844 A.2d 427 (2004), to address the following three questions:

---

4. The Court of Special Appeals also rejected Petitioner's claim that the trial court abused its discretion in excluding certain evidence from the trial. Those evidentiary issues are not before us.

1. What is the territorial jurisdiction for a violation of Md.Code Ann. Family Law Art. § 9–305 with respect to the crimes of detaining and/or harboring a child outside of the State of Maryland?

2. What impact does the *ex post facto* clause have on the legislative changes to Md.Code Ann. Family Law Art. § 9–305 and its increased penalties?

3. What impact do the doctrines of constitutional double jeopardy, the common law doctrine of merger, and the rule of lenity have on Md.Code Ann. Family Law Art. § 9–305?

For reasons discussed below, we hold that the State had territorial jurisdiction to prosecute Petitioner for detaining a child outside of the State of Maryland and that Petitioner's convictions and sentences do not violate the *Ex Post Facto* Clauses of the United States Constitution and Maryland Declaration of Rights. We further hold that, except for Count 5 (accessory to detain a child outside of this State), which merges into Count 9 (accessory to detain a child outside of the United States) for purposes of sentencing, no further modifications to Petitioner's sentences are necessary because, under the required evidence test, the offenses of accessory to child abduction, accessory to child detention, and conspiracy to commit child detention contain distinct elements.

## II. Standard of Review

A trial judge is vested with very broad discretion when sentencing a criminal defendant, so long as the sentence is based upon findings consistent with the jury's verdict. *See Triggs v. State,* 382 Md. 27, 39, 852 A.2d 114, 122 (2004) (citing *Jackson v. State,* 364 Md. 192, 199, 772 A.2d 273, 277 (2001)); *see also Blakely v. Washington,* —— U.S. ——, at ——, 124 S.Ct. 2531, at 2538–39, 159 L.Ed.2d 403, at ——, 2004 WL 1402697, at *6 (2004). Ordinarily, we review the judge's sentencing judgment on three recognized grounds: "(1) whether the sentence constitutes cruel and unusual punishment or violates other constitutional requirements; (2) whether the sentencing judge was motivated by ill will, prejudice or

other impermissible considerations; and (3) whether the sentence is within statutory limits." *Triggs,* 382 Md. 27, 39, 852 A.2d 114, 122 (quoting *Gary v. State,* 341 Md. 513, 516, 671 A.2d 495, 496 (1996)).

 In this case, Petitioner claims her multiple sentences are violations of the *Ex Post Facto* Clauses of the United States Constitution and Maryland Declaration of Rights as well as a violation of the Double Jeopardy Clause of the United States Constitution. As we explained in *Harris v. State,* 303 Md. 685, 496 A.2d 1074 (1985):

> When a claim is based upon a violation of a constitutional right it is our obligation to make an independent constitutional appraisal from the entire record. But this Court is not a finder of facts; we do not judge the credibility of the witnesses nor do we initially weigh the evidence to determine the facts underlying the constitutional claim. It is the function of the trial court to ascertain the circumstances on which the constitutional claim is based. So, in making our independent appraisal, we accept the findings of the trial judge as to what are the underlying facts unless he is clearly in error. We then re-weigh the facts as accepted in order to determine the ultimate mixed question of law and fact, namely, was there a violation of a constitutional right as claimed.

Id. at 697–98, 496 A.2d at 1080 (internal citations omitted); *see also Glover v. State,* 368 Md. 211, 221, 792 A.2d 1160, 1166 (2002) (citing *Rowe v. State,* 363 Md. 424, 432, 769 A.2d 879, 883 (2001)); *Crosby v. State,* 366 Md. 518, 526, 784 A.2d 1102, 1106 (2001). Therefore, with respect to Petitioner's constitutional claims, although we do not engage in *de novo* fact-finding, our application of the law to the facts is *de novo. See Cartnail v. State,* 359 Md. 272, 282–83, 753 A.2d 519, 525 (2000) (stating that, with regard to a Fourth Amendment question, "this Court makes an independent determination of whether the State has violated an individual's constitutional rights by applying the law to the facts").

 Territorial jurisdiction is a factual issue for the trier of fact. *State v. Butler*, 353 Md. 67, 79–80, 724 A.2d 657, 663 (1999) (holding that "when evidence exists that the crime may have been committed outside Maryland's territorial jurisdiction and a defendant disputes the territorial jurisdiction of the Maryland courts to try him or her, the issue of where the crime was committed is fact-dependent and thus for the trier of fact"). When the issue is in dispute, the State has the burden to prove "beyond a reasonable doubt" that the crime was committed within the geographic limits of Maryland. *Id.* at 83–84, 724 A.2d at 665. Consequently, because the issue of territorial jurisdiction is factual and the trial judge acted as the trier of fact in this case, we defer to her determination of territorial jurisdiction unless it is "clearly erroneous." *See Smallwood v. State*, 343 Md. 97, 104, 680 A.2d 512, 515 (1996) (stating that, "[t]o evaluate the sufficiency of the evidence in a non-jury trial," "we will not set aside the trial court's findings of fact unless they are clearly erroneous") (citing *Wilson v. State*, 319 Md. 530, 535, 573 A.2d 831, 833–34 (1990)).

## III. Discussion

### A. Section 9–305 of the Family Law Article

The State charged Petitioner with committing violations of Section 9–305 before and after its amendments became effective on October 1, 2001. Before October of 2001, Section 9–305 of the Family Law Article prohibited participation in the abduction, detention, or harboring of a child "outside of this State." The former statute provided:

If a child is under the age of 16 years, a relative who knows that another person is the lawful custodian of the child may not:

(1) abduct, take, or carry away the child from the lawful custodian to a place outside of this State;

(2) having acquired lawful possession of the child, detain the child outside of this State for more than 48 hours after the lawful custodian demands that the child be returned;

(3) harbor or hide the child outside of this State knowing that possession of the child was obtained by another relative in violation of this section; or

(4) act as an accessory to an act prohibited by this section.

Section 9–305 of the Family Law Article (1984, 1999 Repl. Vol.). A violation of this statute carried a maximum penalty of one year of imprisonment and a $1,000 fine. Section 9–307(c) of the Family Law Article (1984, 1999 Repl.Vol.).[5]

The amendments effective on October 1, 2001 split Section 9–305 into subsections (a) and (b), which established new territorial elements. Subsection (a) addresses the prohibited conduct (abduction, detention, harboring, and acting as an accessory) resulting in the child entering or being held "in another state." Subsection (b) prohibits that conduct when the child is taken or kept "outside of the United States." After the amendments, the statute reads:

(a) *In general.*—If a child is under the age of 16 years, a relative who knows that another person is the lawful custodian of the child may not:

(1) abduct, take, or carry away the child from the lawful custodian to a place in another state;

(2) having acquired lawful possession of the child, detain the child in another state for more than 48 hours after the lawful custodian demands that the child be returned;

(3) harbor or hide the child in another state knowing that possession of the child was obtained by another relative in violation of this section; or

(4) act as an accessory to an act prohibited by this section.

---

**5.** Prior to October 1, 2001, Section 9–307(c) stated:

If the child is out of the custody of the lawful custodian for more than 30 days, a person who violates any provision of § 9–305 of this subtitle is guilty of a felony and on conviction is subject to a fine not exceeding $1,000 or imprisonment not exceeding 1 year, or both.

(b) *Additional restrictions.*—If a child is under the age of 16 years, a relative who knows that another person is the lawful custodian of the child may not:

(1) abduct, take, or carry away the child from the lawful custodian to a place that is outside of the United States or a territory of the United States or the District of Columbia or the Commonwealth of Puerto Rico;

(2) having acquired lawful possession of the child, detain the child in a place that is outside the United States or a territory of the United States or the District of Columbia or the Commonwealth of Puerto Rico for more than 48 hours after the lawful custodian demands that the child be returned;

(3) harbor or hide the child in a place that is outside of the United States or a territory of the United States or the District of Columbia or the Commonwealth of Puerto Rico knowing that possession of the child was obtained by another relative in violation of this section; or

(4) act as an accessory to an act prohibited by this section.

Section 9–305 of the Family Law Article (1984, 1999 Repl.Vol., 2002 Supp.).

The primary significance of the change to Section 9–305 is revealed in the penalty provisions of Section 9–307, which also changed on October 1, 2001. Although the maximum penalty for violating Section 9–305(a) ("in another state") remained one year of imprisonment with a $1,000 fine, due to the amendment, the maximum penalty for violating Section 9–305(b) ("outside of the United States") is three years of imprisonment with a $5,000 fine. Section 9–307(d) of the Family Law Article (1984, 1999 Repl.Vol., 2002 Supp.).[6]

---

**6.** Section 9–307(d) of the Family Law Article currently states: "A person who violates any provision of § 9–305(b) of this subtitle is guilty of a felony and on conviction is subject to a fine not exceeding $5,000 or imprisonment not exceeding 3 years or both."

## B. Territorial Jurisdiction

■ We first dispose of Petitioner's claim that the State lacked territorial jurisdiction to prosecute Counts 8, 9, 14, and 15, all of which alleged that Petitioner violated Section 9–305 after October 1, 2001. Petitioner points out that she was in Egypt, "a sovereign foreign nation," by October 1, 2001, when she committed the acts that allegedly constituted harboring, detention, and conspiracy. She argues that she cannot be convicted in Maryland for a crime committed outside the borders of the State.

The State responds that it had jurisdiction to prosecute Petitioner because her conduct, which resulted in depriving Michael Shannon of the lawful custody of his son, had its effect in Maryland. The State contends that the result of Petitioner's conduct "forms an essential ingredient" of the offenses charged and, therefore, without the deprivation of lawful custody in Maryland, "there simply would be no crime."

■ We have stated that "it is well-settled in Maryland that a court must have territorial jurisdiction over a criminal defendant to exercise its jurisdiction, or power, over that defendant." *State v. Butler*, 353 Md. at 78, 724 A.2d at 662. The general rule under common law is that a state has territorial jurisdiction over a defendant when the crime is committed within the State's "territorial limits." *State v. Cain*, 360 Md. 205, 212, 757 A.2d 142, 145 (2000); *Pennington v. State*, 308 Md. 727, 730, 521 A.2d 1216, 1217 (1987); *see also Wright v. State*, 339 Md. 399, 404, 663 A.2d 590, 592 (1995). Therefore, ordinarily, "[a] person cannot be convicted here for crimes committed in another state." *West v. State*, 369 Md. 150, 158, 797 A.2d 1278, 1282 (2002) quoting *Butler*, 353 Md. at 72–73, 724 A.2d at 660 (quoting *Bowen v. State*, 206 Md. 368, 375, 111 A.2d 844, 847 (1955)); *Cain*, 360 Md. at 214–15, 757 A.2d at 146–47.

In describing the concept of territorial jurisdiction where different elements of a crime have occurred in different states, we have explained:

The common law rule concerning territorial jurisdiction, which is adhered to in Maryland, does not permit prosecution of an offense in every jurisdiction in which any element of the offense takes place. Instead, the common law rule generally focuses on one element, which is deemed "essential" or "key" or "vital" or the "gravamen" of the offense, and the offense may be prosecuted only in a jurisdiction where that essential or key element takes place.

*West,* 369 Md. at 158–59, 797 A.2d at 1283; *see Wright,* 339 Md. at 404, 663 A.2d at 592 (stating that the traditional rule of territorial jurisdiction is that "a state will exercise jurisdiction over a crime only if some conduct or effect constituting a part of that crime was committed within the state"). Thus, we have held that Maryland does not have territorial jurisdiction as to the crimes of first degree rape and first degree sexual offense, unless "the specifically proscribed harmful physical contact" (the key or essential element of those offenses) took place in Maryland. *West,* 369 Md. at 162, 797 A.2d at 1285.

Nonetheless, "under certain circumstances, the defendant's presence is not required in a court's territorial jurisdiction if . . . the intended result or an essential element of his or her crime lies in Maryland." *Butler,* 353 Md. at 74, 724 A.2d at 660. Regarding the offense of obstruction of justice, for example, territorial jurisdiction lies in this State even when "all of the affirmative acts were committed" outside of Maryland because "[t]he gravamen of the crime [is] the intended result in Maryland." *Pennington,* 308 Md. at 733, 735, 521 A.2d at 1219, 1220; *see also West,* 369 Md. at 161, 797 A.2d at 1284.

In *Trindle v. State,* 326 Md. 25, 602 A.2d 1232 (1992), we expounded on these principles as they applied to former Section 9–305 of the Family Law Article, the same statute at issue in this case. Trindle's ex-wife, Alexa Matthai, lived in Kent County with their children. Trindle picked up the children in Wilmington, Delaware for a scheduled period of visitation to be spent in Pennsylvania. *Id.* at 28, 602 A.2d at 1233. Unbeknownst to Matthai, who was the children's lawful

custodian, Trindle and his new wife, Sharon Marcus, took the children and traveled to Amman, Jordan, where the children were kept without Matthai's consent. *Id.* at 28–29, 602 A.2d at 1233–34. When Trindle and Marcus returned to the United States after having been deported from Jordan, they were tried and convicted in the Circuit Court for Kent County for child abduction in violation of former Section 9–305 of the Family Law Article. *Id.* at 30, 602 A.2d at 1234. Although Trindle's appeal was rendered moot when he died prior to his case being argued, Marcus argued on appeal that the Circuit Court did not have territorial jurisdiction to hear her prosecution, because none of her conduct took place in Maryland. *Id.*

We disagreed, holding instead that the Maryland court had territorial jurisdiction over the child abduction charge against Marcus. We explained:

> Marcus's conduct ... consisted of knowingly secreting and harboring Matthai's children with the intent to deprive Matthai of the custody, care and control of those children. It is clear that the intended result of that conduct, i.e. depriving Matthai of custody, forms an essential ingredient of her offense and had its effect in Kent County, Maryland, although the acts which produced that result took place outside of this State.

*Id.* at 32, 602 A.2d at 1235. We also reviewed the law of territorial jurisdiction in other states and were persuaded by those courts that embraced the view that "child abduction or custody interference prosecutions can be heard in the state where the parental custody has been deprived by acts or omissions which occurred outside the state." *Id.* at 36, 602 A.2d at 1237.

The case before us does not differ materially from the circumstances in *Trindle.* Like the appellant in *Trindle,* Petitioner intended to deprive a parent of lawful custody in the State of Maryland. Although her involvement in the conspiracy, detention, and harboring may have taken place well beyond the borders of this State, the intended consequences of those acts reached Maryland, where Michael was

deprived of the lawful custody of his son. As we recognized in *Trindle,* the intentional deprivation of lawful custody "forms an essential ingredient" of the crimes prohibited under Section 9–305.

Furthermore, the bases for territorial jurisdiction in the present case are more cogent than in *Trindle,* where the child's abduction began in Delaware. Unlike *Trindle,* Petitioner's initial criminal acts (the child abduction and conspiracy), which facilitated the detention and harboring of Adam in Egypt, occurred in Maryland. For these reasons, the Circuit Court for Anne Arundel County had territorial jurisdiction over the prosecution of Petitioner's charges.

### C. *Ex Post Facto* Clause

Petitioner maintains that the *Ex Post Facto* Clauses of the United States and Maryland Constitutions bar her prosecution under the amended Section 9–305. The *Ex Post Facto* Clause, Petitioner argues, prohibits her prosecution under the amended statute inasmuch as her crimes were committed and *completed* before the effective date of the statutory amendments.

The State contends that the *Ex Post Facto* Clause does not bar Petitioner's convictions under the amended "new" Section 9–305. The State claims that Petitioner was prosecuted for conduct occurring after the effective date of the amended statute and, therefore, the increased penalties were properly applied. That is, the State argues, Petitioner's conduct constituted continuing offenses that were punishable day to day and, when Petitioner failed to return the children after the "new" Section 9–305 became effective, she exposed herself to prosecution under the amended statute.

Article I, Section 10 of the Constitution of the United States provides in part that "[n]o State shall ... pass any ... ex post facto Law...." Article 17 of the Maryland Declaration of Rights, in more specific terms, also prohibits the passage of *ex post facto* laws: "That retrospective Laws, punishing acts committed before the existence of such Laws, and by them

only declared criminal, are oppressive, unjust and incompatible with liberty; wherefore, no *ex post facto* Law ought to be made; nor any retrospective oath or restriction be imposed, or required." The *Ex Post Facto* Clauses of the United States Constitution and Maryland Declaration of Rights have been viewed generally to have the "same meaning" and are thus to be construed *in pari materia. Evans v. State,* 2004 WL 1635610, *——; *Watkins v. Secretary, Dept. of Public Safety,* 377 Md. 34, 48, 831 A.2d 1079, 1087 (2003); *Frost v. State,* 336 Md. 125, 136–37, 647 A.2d 106, 112 (1994) (citing *Booth v. State,* 327 Md. 142, 169 n. 9, 608 A.2d 162, 175 n. 9, *cert. denied,* 506 U.S. 988, 113 S.Ct. 500, 121 L.Ed.2d 437 (1992)).

 By enacting the *Ex Post Facto* Clause, "the Framers sought to assure that legislative Acts give fair warning of their effect...." *Weaver v. Graham,* 450 U.S. 24, 28, 101 S.Ct. 960, 964, 67 L.Ed.2d 17, 23 (1981). As the Supreme Court has explained recently, "the [*Ex Post Facto* ] Clause protects liberty by preventing governments from enacting statutes with 'manifestly *unjust and oppressive*' retroactive effects." *Stogner v. California,* 539 U.S. 607, ——, 123 S.Ct. 2446, 2449, 156 L.Ed.2d 544, —— (2003) (quoting *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798)). Justice Chase's opinion in *Calder v. Bull,* regarded by the *Stogner* Court as "an authoritative account on the scope of the *Ex Post Facto* Clause," enumerated the types of laws that contravene the *ex post facto* proscription:

> 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

*Id.* at ——, 123 S.Ct. at 2450, 156 L.Ed.2d at —— (quoting *Calder,* at 390–91, 1 L.Ed. at 648) (internal emphasis omitted); *see also Evans,* 2004 WL 1635610, \*——; *Lomax v. Warden, Md. Correctional Training Ctr.,* 356 Md. 569, 576, 741 A.2d 476, 480 (1999).

In accordance with these principles, "[t]wo critical elements must be present for a criminal or penal law to be *ex post facto:* it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *Frost,* 336 Md. at 136, 647 A.2d at 112 (quoting *Weaver,* 450 U.S. at 29, 101 S.Ct. at 964, 67 L.Ed.2d at 23).

The amended Section 9–305, on its face, certainly does not contain either of these elements. As applied to Petitioner as well, the "new" Section 9–305 gave "fair warning" of its effect and, therefore, cannot be considered "manifestly unjust and oppressive." The "new" provisions were not applied to any conduct that Petitioner engaged in before the amendments became effective. Rather, as the indictment expressly states, Petitioner was charged, and later convicted, under the "new" Section 9–305 for violations occurring from October 2001 through May 2002—after the statute's effective date. All conduct that the State alleged occurred before the October 1 effective date was charged under the "old" Section 9–305 and subject to the corresponding penalties under the "old" Section 9–307.

Petitioner's argument that her criminal acts were completed prior to October 1, 2001 is unavailing. Petitioner was convicted under the "new" statute on Count 9 (accessory to detain a child outside of the United States) and on Count 14 (conspiracy to detain a child outside of the United States). Although both of the crimes underlying these counts began before October 1, they are nonetheless continuing offenses that did not cease prior to that date. Consequently, as we explain, Petitioner's constitutional rights were not violated when the State charged her and the trial court convicted and sentenced

her under the amended provisions of Sections 9–305 and 9–307.

As our colleagues on the Court of Special Appeals have noted, a continuing offense is a "transaction or series of acts set on foot by a single impulse . . . no matter how long in time it may occupy. . . . It is an offense which continues day by day." *Beatty v. State,* 56 Md.App. 627, 635, 468 A.2d 663, 667 (1983) (citing Wharton's *Criminal Law,* 14th ed. § 59). We have stated that "[o]rdinarily, a continuing offense is marked by a continuing duty in the defendant to do an act which he fails to do. The offense continues as long as the duty persists, and there is a failure to perform that duty." *Duncan v. State,* 282 Md. 385, 390, 384 A.2d 456, 459 (1978). A "continuing offense" also has been described as generally "one that involves a prolonged course of conduct." *United States v. Rivera–Ventura,* 72 F.3d 277, 281 (2d Cir.1995). The California Supreme Court explained the concept of a "continuing offense" as follows:

Most crimes are instantaneous since they are committed as soon as every element is satisfied. Some crimes, however, are not terminated by a single act or circumstance but are committed as long as the proscribed conduct continues. Each day brings "a renewal of the original crime or the repeated commission of new offenses." The distinction is critical because it determines the application of many legal principles such as the statute of limitations period, venue, jurisdiction, sentencing, double jeopardy, and, as here, the prohibition against ex post facto laws.

*Wright v. Superior Court,* 15 Cal.4th 521, 63 Cal.Rptr.2d 322, 936 P.2d 101, 103 (1997) citing *Toussie v. United States,* 397 U.S. 112, 119, 90 S.Ct. 858, 862, 25 L.Ed.2d 156 (1970).

The application of new statutes to continuing offenses ordinarily presents no *ex post facto* concerns if the charged criminal conduct continued beyond the law's effective date. As the United States Court of Appeals for the Second Circuit stated, "the Ex Post Facto clause is not violated by application of a statute to an enterprise that began prior to, but continued

after, the effective date of [the statute]." *United States v. Harris,* 79 F.3d 223, 229 (2d Cir.1996); *see also United States v. Kramer,* 955 F.2d 479, 485 (7th Cir.1992) ("It is well settled that the ex post facto clause is not applicable to offenses which began before the effective date of a statute and continue thereafter."); *People v. Grant,* 20 Cal.4th 150, 83 Cal.Rptr.2d 295, 973 P.2d 72, 77 (1999) ("Where an offense is of a continuing nature, and the conduct continues after the enactment of a statute, that statute may be applied without violating the ex post facto prohibition.") (quoting *People v. Palacios,* 56 Cal. App.4th 252, 65 Cal.Rptr.2d 318, 320 (1997)).

 Whether a particular crime constitutes a continuing offense is primarily a question of statutory interpretation. *Wright,* 63 Cal.Rptr.2d 322, 936 P.2d at 104 (citing *Toussie,* 397 U.S. at 115, 90 S.Ct. at 860, 25 L.Ed.2d at 161). Although the express statutory language may provide an answer, equally important to the determination is whether "the nature of the crime involved is such that [the Legislature] must assuredly have intended that it be treated as a continuing one." *Id.* The concept of "continuing offense" has embraced such crimes as embezzlement, *State v. Thang,* 188 Minn. 224, 246 N.W. 891 (1933), bigamy, *Cox v. State,* 117 Ala. 103, 23 So. 806 (1898), nuisance, *State v. Dry Fork R. Co.,* 50 W.Va. 235, 40 S.E. 447 (1901), and the repeated failure to pay taxes, *United States v. Sullivan,* 255 F.3d 1256 (10th Cir.2001). Courts also have determined that "continuing offenses" include failing to register as a sex offender, *Arizona v. Helmer,* 203 Ariz. 309, 53 P.3d 1153, 1155 (2002), and being a deported alien found in the United States, *United States v. Ramirez–Valencia,* 202 F.3d 1106, 1110 (9th Cir.2000). We have held that the crime of failing to pay child support is a continuing offense. *State v. James,* 203 Md. 113, 119, 100 A.2d 12, 14 (1953).

 The crime of conspiracy is perhaps the classic example of a "continuing offense." *See e.g., United States v. Hersh,* 297 F.3d 1233, 1244 (11th Cir.2002); *United States v. Terzado–Madruga,* 897 F.2d 1099, 1124 (11th Cir.1990) ("Since conspiracy is a continuous crime, a statute increasing the

penalty for a conspiracy beginning before the date of enactment but continuing afterwards does not violate the *ex post facto* clause."); *United States v. Duncan*, 42 F.3d 97, 104 (2d Cir.1994) ("[A]ccording to our precedents, continuing offenses such as conspiracy and bank fraud do not run afoul of the *Ex Post Facto* Clause if the criminal offenses continue after the relevant statute becomes effective."); *United States v. Baresh*, 790 F.2d 392, 404 (5th Cir.1986) ("[B]ecause conspiracy is a continuing crime, a statute increasing the penalty for a conspiracy beginning before the date of enactment but continuing afterwards does not offend the [*Ex Post Facto* Clause]."); *United States v. Campanale*, 518 F.2d 352, 365 (9th Cir.1975) ("It is well established that a statute increasing a penalty with respect to a criminal conspiracy which commenced prior to, but was continued beyond the effective date of the statute, is not *ex post facto* as to that crime.").

Likewise, the crime of detaining a child under Section 9–305 constitutes a continuing offense. Although the statutory language does not expressly describe the crime as such, detention is, by its very nature, continuous. Words in a statute are generally given their "natural and usual meaning." *Holbrook v. State*, 364 Md. 354, 364, 772 A.2d 1240, 1246 (2001); *Brown v. State*, 311 Md. 426, 435, 535 A.2d 485, 489 (1988) (stating that "words in a statute are generally given their common and ordinary meaning"). Black's Law Dictionary defines "detention" as "[t]he act or fact of holding a person in custody; confinement or compulsory delay." BLACK'S LAW DICTIONARY 459 (7th ed.1999). This definition describes continuous conduct in the sense that the detention "achieves no finality" until the victim is released or dies. *See United States v. Cores*, 356 U.S. 405, 409, 78 S.Ct. 875, 878, 2 L.Ed.2d 873, 877 (1958); *cf. State v. Stouffer*, 352 Md. 97, 116, 721 A.2d 207, 217 (1998) (describing kidnapping as a "continuing crime, remaining in effect until the hostage is safely released"). The crime carries on at least until the offender takes action to return the child to the care of the lawful custodian or the child achieves the age of majority.

The court in *People v. Caruso,* 152 Ill.App.3d 1074, 105 Ill.Dec. 821, 504 N.E.2d 1339 (1987) reached a similar conclusion. In that case, the defendant, Caruso, was charged with the statutory offenses of child abduction and unlawful restraint involving his two children. *Id.* at 1340. Caruso argued before the appellate court that the *Ex Post Facto* Clause barred the child abduction count because the abduction occurred in 1977, before the child abduction statute was enacted in 1978 and subsequently amended in 1984. *Id.* at 1340–41. The court, however, accepted the State's argument that "the offense of child abduction, as charged in the indictments at issue here, is for the detention of the children, a continuing act, and is therefore not based on the initial taking before the child abduction statute was enacted." *Id.* at 1340. The court explained:

Defendant is not being prosecuted for the abduction or detention of the children prior to the enactment of the statute. He is charged with detaining the children on December 24, 1984, a date after enactment of the child abduction statute and after the effective date of the 1984 amendment to this statute. Although the detention of the children also occurred before the enactment of the law, the statute was alleged to be violated by the continued detention of the children after passage of the statute.

*Id.* at 1341. Based on this reasoning, the court concluded that "neither the statute as amended nor the indictments apply to events occurring before the enactment of the statute, and the law is not facially or as applied violative of the *ex post facto* provisions of the United States or Illinois constitutions." *Id.;* *see also People v. Westman,* 262 Mich.App. 184, 685 N.W.2d 423 (2004) (relying on an unpublished appellate opinion in which the court held that there was no *ex post facto* violation where parental kidnapping continued after the effective date of the amended statute).

The charges against Petitioner under the "new" Section 9–305 alleged conduct committed after the effective date of the statute. The amended law, therefore, only "operates solely with respect to subsequent conduct" and does not "change[ ]

the legal consequences of acts *completed* before its effective date." *Wright,* 63 Cal.Rptr.2d 322, 936 P.2d at 107 (citation omitted). The detention and conspiracy continued through and after the amended Sections 9–305 and 9–307 became effective. Petitioner's crimes, for purposes of prosecution, terminated only after she was taken into custody. By assisting in the criminal efforts to confine Adam after October 1, 2001, Petitioner violated the new statute, and, hence, her convictions under the amended statute do not offend the *Ex Post Facto* Clauses of the United States Constitution and Maryland Declaration of Rights.

## D. Multiplicity

Challenging her multiple sentences, Petitioner invokes the Double Jeopardy Clause of the United States Constitution and the common-law rule of merger. She claims that the indictment impermissibly charged the same offense in multiple counts when, in her view, "there can be but one violation" and "but one sentence for a violation of [Section] 9–305." She maintains further that the legislative intent is ambiguous as to whether Section 9–305 permits multiple punishment and, therefore, under the rule of lenity, she should have received a single sentence of no more than one year imprisonment for a single violation of the statute.

In response, the State argues that the indictment was not multiplicative because it charged Petitioner with committing separate and distinct types of conduct prohibited by Section 9–305. According to the State, the convictions should not merge for purposes of sentencing because each offense for which Petitioner was convicted contains a distinct element that the others do not. Therefore, under the State's position, Petitioner was properly convicted of violating the "new" Sections 9–305(b), for which the trial judge properly imposed a three-year sentence.

 The Fifth Amendment to the United States Constitution, which is applicable to the States, provides that no person shall "be subject for the same offense to be twice put

in jeopardy of life or limb. . . ." *Benton v. Maryland*, 395 U.S. 784, 796, 89 S.Ct. 2056, 2063, 23 L.Ed.2d 707, 716 (1969); *State v. Boozer*, 304 Md. 98, 101, 497 A.2d 1129, 1130 (1985). The Double Jeopardy Clause forbids multiple convictions and sentences for the same offense. *Holbrook*, 364 Md. at 369, 772 A.2d at 1248; *Nightingale v. State*, 312 Md. 699, 702, 542 A.2d 373, 374 (1988); *Brown v. State*, 311 Md. 426, 431, 535 A.2d 485, 487 (1988); *Boozer*, 304 Md. at 101, 497 A.2d at 1130. Under the common-law rule of merger as well, when offenses merge, "separate sentences are normally precluded." *State v. Lancaster*, 332 Md. 385, 392, 631 A.2d 453, 457 (1993); *see White v. State*, 318 Md. 740, 743, 569 A.2d 1271, 1273 (1990). Offenses merge and separate sentences are prohibited when, for instance, a defendant is convicted of two offenses based on the same act or acts and one offense is a lesser-included offense of the other. *Lancaster*, 332 Md. at 391, 631 A.2d at 456.

"Under 'both federal double jeopardy principles and Maryland merger law, the test for determining the identity of offenses is the required evidence test.' " *Nightingale*, 312 Md. at 703, 542 A.2d at 374; *see, e.g., Holbrook*, 364 Md. at 369–70, 772 A.2d at 1249 ("[U]nder Maryland common law, the required evidence test is the appropriate test for determining whether the different statutory or common law offenses, growing out of the same transaction, are to merge and be treated as the same offense for double jeopardy purposes."); *Dixon v. State*, 364 Md. 209, 236, 772 A.2d 283, 299 (2001); *Lancaster*, 332 Md. at 391, 393 n. 8, 631 A.2d at 456, 457 n. 8 ("In addition to being the normal standard for determining merger of offenses under Maryland common law, the required evidence test is also the usual test for determining when two separate offenses . . . shall be deemed the same for purposes of the prohibition against double jeopardy."); *Monoker v. State*, 321 Md. 214, 219, 582 A.2d 525, 527 (1990); *White*, 318 Md. at 743, 569 A.2d at 1272.[7]

---

7. As we observed in *Holbrook*, 364 Md. at 369 n. 9, 772 A.2d at 1249 n. 9 and *Lancaster*, 332 Md. at 393, 631 A.2d at 457, the required evidence

 Writing for this Court in *Lancaster*, Judge Eldridge provided a thorough explanation of the required evidence test:

> The required evidence test focuses upon the elements of each offense; if all of the elements of one offense are included in the other offense, so that only the latter offense contains a distinct element or distinct elements, the former merges into the latter. *Snowden v. State, supra,* 321 Md. at 617, 583 A.2d at 1059, quoting *State v. Jenkins,* 307 Md. 501, 517, 515 A.2d 465, 473 (1986). Stated another way, the required evidence is that which is minimally necessary to secure a conviction for each ... offense. If each offense requires proof of a fact which the other does not, or in other words, if each offense contains an element which the other does not, there is no merger under the required evidence test even though both offenses are based upon the same act or acts. But, where only one offense requires proof of an additional fact, so that all elements of one offense are present in the other, and where both offenses are based on the same act or acts ... merger follows. *Williams v. State, supra,* 323 Md. at 317–318, 593 A.2d at 673, quoting in part *Thomas v. State,* 277 Md. 257, 267, 353 A.2d 240, 246–47 (1976).

332 Md. at 391–92, 631 A.2d at 456–57 (internal quotations marks omitted). The required evidence test is the "threshold" test and, if it is met, merger follows as a matter of course. *Id.* at 394, 631 A.2d at 458.

 If, however, the required evidence test is not fulfilled because the offenses in question have distinct or separate elements, we move to a separate inquiry: whether the principle of statutory construction known as the rule of lenity requires merger. *Holbrook,* 364 Md. at 373, 772 A.2d at

---

test is also known as the *"Blockburger"* test, *see Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the "same evidence" test, *see Dixon v. State,* 364 Md. 209, 236–37, 772 A.2d 283, 299 (2001), the "elements" test, *see Hagans v. State,* 316 Md. 429, 449–50, 559 A.2d 792, 801–02 (1989), and the "same elements" test, *see United States v. Dixon,* 509 U.S. 688, 696, 113 S.Ct. 2849, 2856, 125 L.Ed.2d 556, 568 (1993).

1251. The rule of lenity allows us to avoid "interpret[ting] a ... criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what [the legislature] intended." *Id.* (quoting *Monoker v. State*, 321 Md. 214, 222, 582 A.2d 525, 529 (1990)). As it is a principle of statutory construction, the rule of lenity applies where both offenses are statutory in nature or where one offense is statutory and the other is a derivative of common law. *Monoker*, 321 Md. at 223, 582 A.2d at 529. Judge Cole, on behalf of the Court in *Monoker v. State*, explained the operation of the rule of lenity succinctly:

> Even though two offenses do not merge under the required evidence test, there are nevertheless times when the offenses will not be punished separately. Two crimes created by legislative enactment may not be punished separately if the legislature intended the offenses to be punished by one sentence.... [I]f we are unsure of the legislative intent in punishing offenses as a single merged crime or as distinct offenses, we in effect, give the defendant the benefit of the doubt and hold that the crimes do merge.

321 Md. at 222, 582 A.2d at 529. When offenses merge under the rule of lenity, "the offense carrying the lesser maximum penalty ordinarily merges into the offense carrying the greater maximum penalty." *Miles v. State*, 349 Md. 215, 229, 707 A.2d 841, 848 (1998).

 Petitioner was sentenced for convictions on four counts: Count 4 (accessory to child abduction), Count 5 (accessory to child detention outside of this State), Count 9 (accessory to child detention outside of the United States), and Count 14 (conspiracy to child detention outside of the United States). We must determine, therefore, under the required evidence test and the rule of lenity, whether any of these offenses constitute the same offense and must be merged.[8]

---

8. We recognize that the question of merger may also turn on other considerations, such as "historical treatment, judicial decisions which generally hold that offenses merge, and fairness." *McGrath v. State*, 356 Md. 20, 25, 736 A.2d 1067, 1069 (1999) (quoting *Miles*, 349 Md. at

The elements of the crimes of child abduction and child detention are not the same under Section 9–305. Child abduction under the "old" and "new" Sections 9–305 has the following elements: (1) a child under 16 years of age; (2) a relative who is not the lawful custodian of the child; (3) the relative knows that he or she is not the lawful custodian; (4) the relative abducts, takes, or carries away the child from the lawful custodian; (5) to a place outside this State. Child detention, on the other hand, requires: (1) a child under 16 years of age; (2) a relative who is not the lawful custodian of the child; (3) the relative knows that he or she is not the lawful custodian; (4) the non-custodial relative acquires lawful possession of the child; (5) the custodian demands the child's return; (6) the non-custodial relative detains the child; (7) the detention lasts for 48 hours after the demand was made; and (8) the detention occurs outside of this State. Although both offenses of child abduction and child detention share elements 1 through 3 as well as the territorial elements (outside of this State), child detention does not require any abduction, taking or carrying away. The offense of child abduction, on the other hand, does not require lawful possession, a return demand, detention, and 48–hour lapse of time. These two offenses possess several distinct elements; therefore, they do not merge under the required evidence test.

Nor do the abduction and detention convictions merge under the rule of lenity. Under Section 9–305, the legislature unambiguously set out under different subsections several separate categories of prohibited conduct, including child abduction and detention. Child abduction and detention describe two completely different acts: one involving the initial taking of the child and the other involving the child's confine-

221, 707 A.2d at 844). Conversely, even when one offense is included in another, "the offenses still may not merge under some circumstances where the General Assembly has 'specifically or expressly authorized multiple punishments.'" *Miles,* 349 Md. at 220, 707 A.2d at 844 (quoting *Lancaster,* 332 Md. at 394, 631 A.2d at 458). Petitioner relies only on the required evidence test and the rule of lenity to challenge her multiple sentences, so our analysis focuses on these two standards.

ment after the lawful custodian has made a demand for the child's return. The mere fact that, in this case, an abduction preceded the eventual detention of Adam does not suggest that the legislature intended the two crimes to be punished together. Rather, we believe that the General Assembly meant child abduction and child detention to constitute separately punishable offenses.

■ Turning to the conspiracy count, we note that a substantive offense is generally distinct from the crime of conspiracy to commit the offense. *See Grandison v. State,* 305 Md. 685, 759, 506 A.2d 580, 617 (1986); *accord Apostoledes v. State,* 323 Md. 456, 461–63, 593 A.2d 1117, 1120–21 (1991); *Cooper v. State,* 128 Md.App. 257, 271, 737 A.2d 613, 620 (1999) (citing *Townes v. State,* 314 Md. 71, 75, 548 A.2d 832, 834 (1988)). We have summarized the elements of a conspiracy as follows:

> A criminal conspiracy consists of the combination of two or more persons to accomplish some unlawful purpose, or to accomplish a lawful purpose by unlawful means. The essence of a criminal conspiracy is an unlawful agreement. The agreement need not be formal or spoken, provided there is a meeting of the minds reflecting a unity of purpose and design. In Maryland, the crime is complete when the unlawful agreement is reached, and no overt act in furtherance of the agreement need be shown.

*Townes,* 314 Md. at 75, 548 A.2d at 834.

In *Grandison,* we rejected the argument that a charge of conspiracy to murder should merge with a charge of murder based on the defendant's role as an accessory before the fact. 305 Md. at 759, 506 A.2d at 617. Explaining the distinct elements of the conspiracy and the completed crime, we stated:

> It is clear that the substantive crime of murder is distinct from the crime of conspiracy to commit murder. The argument is made here, however, that since Grandison's murder conviction was based on his being an accessory before the fact, his conviction for conspiracy to murder and

the murder conviction should merge. What Grandison overlooks simply is that accessoryship is not a substantive crime but merely the mechanism by which culpability for the substantive crime is incurred. A completed crime is a necessary element. With conspiracy to murder, on the other hand, once the agreement to murder has been made, the crime is complete without any further action. In short, each of these crimes requires an element distinct from the other. Conspiracy to murder requires an agreement, while murder, regardless of whether one is convicted as an accessory or a principal, requires the completed crime. Thus it is apparent that the conspiracy to murder is a separate and distinct crime from the substantive crime itself.

*Id.*

The same distinctions apply with respect to the crimes of conspiracy to detain a child and accessory to detain a child. At the moment when one unlawfully agrees to detain a child in violation of Section 9–305, the continuing crime of conspiracy has been committed. No further action is necessary. For one to act as an accessory to the continuing offense of child detention, though, no unlawful agreement is required, but the child must have been detained for at least 48 hours after the custodial parent demanded the child's return. In other words, unlike for a conviction of conspiracy, the crime of accessory to child detention requires actual detention of a child that violates the provisions of Section 9–305. Because of the distinct elements of the two crimes, it is clear that the legislature intended Petitioner's conspiracy to be punished as well as her role in the actual detention. Additionally, we have identified no statutory ambiguity that would compel the merger of the conspiracy and child detention counts. The two offenses, consequently, do not merge.

■ As for the two child detention counts spanning different time periods, we reach a different conclusion. When Section 9–305 was amended on October 1, 2001, the Legislature altered only the territorial element of the offense of child detention. Pre-amendment Section 9–305 criminalized the act

of child detention "outside of this State." After October 1, 2001, Section 9–305(a) prohibited child detention in "another state," while Section 9–305(b) prohibited such conduct "outside of the United States." Petitioner was convicted and sentenced separately for detaining Adam from August through September of 2001 "outside of this State" and for detaining Adam from October of 2001 through May of 2002 "outside of the United States."

An application of the required evidence test demonstrates that child detention outside of this State is a lesser included offense of child detention outside of the United States. First of all, the child detention, although it continued day by day, was not separately punishable daily, unless, quite possibly, some intervening event occurred. As Petitioner continually assisted in confining Adam to her residence in Egypt, she did not commit a new offense each day but rather a single offense that continued throughout the duration of that detention. In proving that single offense, the State had the burden to prove the territorial element of "outside of the United States" to show a violation of the "new" Section 9–305. To prove the charge that Petitioner violated the "old" Section 9–305, the State had to prove detention "outside of this State." Proving detention outside of the United States, however, also necessarily requires proving detention "outside of this State." Thus, under the circumstances in this case, Petitioner could not have committed child detention outside of the United States without having also committed child detention outside of this State. Because all of the elements of Count 5 (child detention outside of this State) are included in the offense charged under Count 9 (child detention outside of the United States), the former merges into the latter. *See Lancaster,* 332 Md. at 401, 631 A.2d at 461 (holding that two offenses merged because proof of one necessarily required proof of the other); *Snowden v. State,* 321 Md. 612, 617, 583 A.2d 1056, 1059 (1991).

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO VACATE THE SENTENCE IM-*

*POSED BY THE CIRCUIT COURT FOR ANNE ARUN-DEL COUNTY ON THE CONVICTION OF ACCESSORY TO CHILD DETENTION OUTSIDE OF THIS STATE AND TO AFFIRM THE REMAINING CONVICTIONS OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY. COSTS IN THIS COURT AND IN THE COURT OF SPE-CIAL APPEALS TO BE PAID BY PETITIONER.*